# Illinois Official Reports

## Appellate Court

---

***People v. Williams*, 2013 IL App (1st) 111116**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CRANDALL WILLIAMS, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-11-1116 |
| Filed | December 13, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a prosecution for first degree murder, home invasion and armed robbery where there were no eyewitnesses, defendant was arrested three years later as a result of information provided by a jailhouse informant, no one testified he was near the scene, he made no statement to the police, and identification based on DNA evidence was the issue at trial, defendant's convictions were reversed and the cause was remanded for a new trial, since the trial court found defendant guilty by mistakenly recalling that defendant's DNA expert agreed with the conclusion of one of the State's experts that "certainly it was" defendant and that mistake was not harmless beyond a reasonable doubt. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-7754; the Hon. Frank Zelezinski, Judge, presiding. |
| Judgment | Reversed and remanded. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Katherine M. Donahoe, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Peter D. Fisher, Assistant State's Attorneys, of counsel), for the People. |
| | |
| | |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion. |
| | Justice Hall concurred in the judgment and opinion. |
| | Justice Lampkin dissented, with opinion. |

**OPINION**

¶ 1    Defendant Crandall Williams was convicted, after a bench trial, of (1) first degree murder, (2) home invasion and (3) armed robbery. After hearing factors in aggravation and mitigation, the trial court sentenced him to consecutive terms of 80 years for first degree murder, 20 years for home invasion, and 20 years for armed robbery, for a total of 120 years in the Illinois Department of Corrections (IDOC).

¶ 2    On this direct appeal, defendant raises only one issue for our consideration. He argues that he was denied due process of law when the trial court based its finding of guilt at his bench trial on a mistaken recollection of the testimony of the defense's DNA expert. For the following reasons, we reverse and remand for a new trial.

¶ 3                              I. Background

¶ 4    In the case at bar, someone broke into the home of 82-year-old Walter Pinianski, burglarized his house and stabbed him to death. The only issue at trial was the identity of the perpetrator. There were no eyewitnesses, and defendant was not arrested at the crime scene but rather three years later.

¶ 5    The State's identification evidence consisted solely of: (1) DNA evidence; and (2) the testimony of a jailhouse informant. The DNA evidence was obtained from a pair of bloody gloves found inside the victim's home. The blood came only from the victim, but a swab of the inside of the gloves revealed a mixture of DNA material which was contributed by at least three different individuals. Thus, at least three different people had worn the gloves.

¶ 6    The DNA evidence was reviewed by two laboratories that did the original tests and generated the data and by two experts retained by each side to review the already-generated data and offer additional interpretations of it. The two laboratories were operated by the Illinois

State Police and Bode Laboratories (Bode); and the two experts were Dr. Rick Staub of Cellmark Laboratory (Cellmark), for the State; and Dr. Karl Reich of Independent Forensics Laboratory, for the defense. Of these four laboratories–the Illinois State Police, Bode, Cellmark and Independent Forensics–only Dr. Staub of Cellmark concluded that defendant was a match. Dr. Staub disagreed with all the other laboratories, including the Illinois State Police.

¶ 7        Of the three laboratories engaged by the State, not one agreed with the other. All three–the Illinois State Police, Bode Laboratories, and Cellmark–interpreted the data differently and reached different conclusions about which alleles from the mixture could be attributed to the major contributor. Although acknowledging that he disagreed with the other experts, the State's expert, Dr. Staub of Cellmark, testified that he alone interpreted the data to identify the alleles belonging to the major contributor in such a way that they matched defendant's profile. Dr. Staub admitted that he had defendant's profile in his possession, as he was trying to determine the profile of the major contributor, and that he did not rely on mathematical calculations in determining which alleles belonged to the major contributor, although he admitted that "[g]enerally, there is a mathematical relationship." However, on rebuttal, he testified that he made some calculations while the defense expert was testifying.

¶ 8        The defense expert, Dr. Karl Reich of Independent Forensics, explained why the mixture made an identification impossible and why all that could be concluded was that defendant could not be excluded as a possible contributor.

¶ 9        At the close of the bench trial, the trial court found that the testimony of James Worthem, the jailhouse informant, "must be viewed with extreme caution" and that it was merely "corroborati[ve] [of the] other evidence." No other witness placed defendant in the neighborhood where the offense occurred, and there was no statement by defendant to the police. However, relying primarily on the DNA evidence, the trial court found defendant guilty. In describing the DNA evidence, the trial court mistakenly stated: "regardless of all, Dr. Reich did, through laborious cross-examination, have to indicate that certainly it was still the defendant." It is this mistake in recalling the testimony of defendant's sole witness that is at issue on appeal.

¶ 10                          A. The State's Evidence

¶ 11        The State's first witness was Patricia Pinianski, the victim's daughter. She testified that Walter lived at 12500 South Paulina Street in Calumet Park for 48 years. In 2005, Patricia's husband was suffering from brain cancer, and Patricia called Walter every couple of days to let him know how her husband was doing. On February 9, 2005, when Patricia was unable to reach her father, she called the Calumet Park police to request a wellness check.

¶ 12        Patricia testified that Walter's house was very neat and uncluttered. He kept a lot of cash in various places in the house, such as in an envelope in a closet above the doorway; in a compartment of an old desk in the living room; and in a drawer in his bedroom.

¶ 13        The State's second witness, Angela Sanchez, testified that, on February 4, 2005, she worked as a bank teller at the Great Lakes Bank located at 13057 South Western Avenue in

- 3 -

Blue Island. At 1:51 p.m. on that day, Walter Pinianski made a deposit of two checks totaling $1,660.99 into his account, and withdrew $800 in cash.

¶ 14    The State's third witness was Judith Boyer, an assistant vice president of security at Great Lakes Bank, who identified a Great Lakes Bank savings deposit slip with Walter Pinianski's name on it. The automated stamp on the back of the slip indicated that the deposit was made on February 4, 2005, at 1:51 p.m., and that the bank teller who processed the transaction was Angela Sanchez, whose teller identification number was 718. The automated stamp was done in the ordinary course of business of Great Lakes Bank.

¶ 15    The State's next witness was Judith Chapan, a 911 dispatch operator at the Calumet Park police department, who identified call records from February 6, 2005, that had been authored by her partner.[1] The records documented 911 calls by Walter Pinianski and indicated that Walter's first call was at 1:34 a.m. on February 6, 2005. The record of this call stated: "[a] male subject was knocking on the door asking for $5.00. Last seen walking southbound on Paulina from address." Walter's next call was at 1:36 a.m. and concerned "a male subject banging on the door."

¶ 16    The State's next witness, John Shefcik, was a patrol officer at the Calumet Park police department in February 2005. On February 9, 2005, at 9:18 p.m., he was assigned to do a wellness check on Walter Pinianski at his residence. While Shefcik had been to Walter's residence to check on his well-being several times before, he had not been there that week.

¶ 17    Shefcik testified that Walter's house is a small brick ranch home on a pie-shaped double lot with a large yard which wraps around the house. There is no garage. To the north is an alley which also borders the Metra train tracks. To the east is Paulina Street. To the west, behind the house, is an alley, and then Page Street. Thus, the only neighbor is located to the south of Walter's house.

¶ 18    Shefcik further testified that, when he arrived at Walter's residence, it was snowing outside and the house was completely dark, which was unusual. Shefcik knocked on the front door, but received no response. He walked around the house and noticed that, on the north side of the house, the basement window had been broken. There were no footprints in the snow leading to the broken window and there was no broken glass in the yard. Shefcik returned to the front door and turned the doorknob, which was unlocked. When he had been to Walter's house on previous occasions, the door had always been locked, and Walter had opened the door for him.

¶ 19    Prior to entering the house, Shefcik called for backup. He did not enter the house until Sergeant Jones arrived, and they both entered together. Just inside the front door was a large living room with couches and a television set. Shefcik observed that the cushions from the couch were on the floor. After one walked through the living room, there was a small hallway with a bedroom to the immediate left and another bedroom to the immediate right. The kitchen was located in the back of the house. When Shefcik looked in the kitchen, he observed the victim, Walter Pinianski, lying on the kitchen floor. As Shefcik and Jones performed a

---

[1]Chapan did not testify that she was a custodian of these records. However, no objection was made at trial to Chapan testifying about the records created by her partner.

protective sweep for possible offenders, Shefcik observed envelopes and papers strewn about Walter's bedroom.

¶ 20        Illinois State Trooper James Gainer testified that he was the crime scene investigator assigned to this case and that he arrived at 12500 South Paulina at 10:28 p.m. on February 9, 2005. He entered the residence through the front door and went into the living room area. The area looked ransacked, with couch cushions on the floor and papers strewn about. Gainer walked through the living room and the hallway and entered the kitchen, where he observed the victim, Walter Pinianski, lying on the floor in a pool of dried blood. Gainer then went downstairs to the basement and observed that the window on the north side of the basement had been broken. There were glass fragments on the floor below the window and in the laundry tub below the window.

¶ 21        Gainer photographed the scene and processed the scene for fingerprints. Specifically, he developed latent prints from a PVC pipe located directly below the broken window and from a washing machine also in the basement. The prints on the PVC pipe and on the washing machine both showed a pattern of small black dots. While he was in the living room, he noticed and collected a pair of white gloves that contained black rubber dots in a pattern resembling the patterns in the prints obtained from the PVC pipe and the washing machine.

¶ 22        The next morning, on February 10, 2005, Gainer went to the Cook County medical examiner's office to attend Walter's autopsy. He photographed and documented the autopsy and obtained Walter's fingerprints and created a blood card for him. A blood card contains a sample of the victim's blood. It is a small three-by-five index card, on which is placed five droplets of the victim's blood for future testing. Gainer was able to collect a set of fingerprints only from Walter's right hand, as Walter's left hand was too decayed. Gainer returned to the scene on February 10, 2005, to photograph a telephone box on the west side of Walter's residence, and observed that the wires to the box had been cut.

¶ 23        Gainer further testified that, on March 25, 2008, he went to 12415 South Honore Street in Calumet Park with several police officers from the Illinois State Police and the South Suburban Major Crimes Task Force. They met defendant there who agreed to return to the police department with them. At the police department, Gainer collected a buccal swab from the inside of both of defendant's cheeks.

¶ 24        The medical examiner who performed the autopsy did not testify, but a certified "Report of Postmortem Examination," a self-authenticating document, was admitted into evidence pursuant to section 115-5.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-5.1 (West 2010)). According to the report, Walter died from multiple stab wounds. Walter's death certificate was also admitted into evidence, but only for the limited purpose of establishing the date of his death, the identity of the decedent, and his age at the date of his death.

¶ 25        James Worthem, an inmate at IDOC, testified about several conversations he had with defendant while Worthem was in custody at Cook County jail. On April 18, 2008, defendant, whom Worthem knew as "Little C," approached him and asked if he knew anything about burglaries and DNA. During their conversation, defendant mentioned some houses in Calumet Park which all looked the same and that he often asked people in these houses if they needed help because the houses often flood.

¶ 26    On the following day, April 19, 2008, defendant approached Worthem again, when Worthem was in his cell with his cellmate. This time the conversation concerned DNA. Worthem told defendant what he knew about DNA, including that "if you are locked up, they do a cotton swab in your mouth and if you did do that while you were incarcerated, that you are registered on the data as a certain DNA."[2] Defendant told Worthem that he had burglarized a house two blocks away from his mother's house and that he may have left inside the house a pair of white canvas gloves which he had received from his father.

¶ 27    On the next day, April 20, 2008, defendant approached Worthem a third time. Their conversation was about the glove and the burglary. According to Worthem, defendant stated that he used the glove to break the basement window, that the glove had blood on it, and that he had left it inside the house. Defendant told Worthem that the glove was made of white canvas with a bunch of little black rubber grips on the outside. The house was down the street from the Chicago borderline of "Cal Park." Defendant also told Worthem how he and his partner, Pierre, entered the house. They knocked on the door and nobody answered, so they went down to the basement windows. Defendant punched a hole through the glass, and then they crawled through the broken window into the basement. They went upstairs and heard someone say, "Is anybody there?" Defendant then noticed an old man coming toward them and waving his arms. Defendant did not know if the man was coming to attack him, so he took out his knife and began stabbing him. Defendant said that "it [felt] like a pin stabbing a cushion."[3] Defendant stabbed the man for a few seconds, and the victim was screaming. Defendant kept stabbing until the victim lay quiet on the floor. After the stabbing, defendant and his partner ransacked the house. Defendant discovered some military pennants in a closet and kept them as souvenirs. He also took cash, but he did not tell Worthem how much. Worthem asked defendant for his full name, and defendant stated that his full name was Crandall Williams.

¶ 28    Worthem testified that he was not promised anything in exchange for his testimony and that he came forward voluntarily and made all the contacts with the State because he has a lot of family members in the military, including a cherished grandfather, and he felt sorry for the victim and felt it was "the right thing to do." Worthem was aware that the State can do favors for witnesses because he had previously cooperated with federal law enforcement officers in drug stings in 2005 and 2006. At the time of his trial testimony, Worthem had a pending postconviction petition and a petition under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2010)), but he told the State's Attorney's office that he did not want its help. Worthem admitted that he had previously been convicted for robbery and armed robbery and that he "practiced law" *pro se* and had used aliases in the past.

¶ 29    Worthem testified on cross-examination that he made a statement on a videotape on May 6, 2008, about this incident. The statement was taken at IDOC in the presence of Assistant State's

_____

[2]However, as stated above, State Trooper Gainer testified that defendant agreed to go with the officers to the police station so that they could obtain a buccal swab from him.

[3]Later, on cross-examination, Worthem testified that defendant said that on May 6, 2008.

- 6 -

Attorney (ASA) D'Angelo[4] and police investigators. At that time, Worthem did not volunteer that his cellmate was also present during his conversations with defendant. In addition, Worthem may have mentioned on the videotape that defendant told him that he hurt his hand when he broke the window, and that he was bleeding inside the glove.[5] Further, Worthem testified that defendant had told him on May 6, 2008, instead of April 20, 2008, that stabbing the old man felt like a pin stabbing a cushion.

¶ 30    Katherine Sullivan testified that she was a forensic biologist with the Illinois State Police (ISP) at the Joliet Forensic Science Laboratory, and the parties stipulated that she was an expert in the field of forensic DNA. She testified both about the basics of DNA science as well as what she did in this particular case. She explained that everyone except identical siblings has different DNA, and that polymerase chain reaction (PCR) is a process to make copies of DNA. Further, she explained the procedures that she uses in her DNA analysis. First, the DNA has to be extracted from the material that it is in and placed in a liquid solution. Then the amount of DNA needs to be quantified, and the PCR process is used to tag the areas of DNA to be profiled. She uses an instrument to detect those tags, and she uses some software to develop the DNA type from the sample and to make a comparison to the standard that is submitted for the case.

¶ 31    After describing the DNA process in general, Sullivan then testified about the DNA analysis she did for this case. She received the gloves from the crime scene in a brown paper bag and collected hair and fiber from the outside of the gloves and swabbed the inside. These swabs were dried and placed in a separate envelope that she labeled Exhibit 1-A. She also prepared a portion of the blood standard for the victim. She removed five circles with dark red stains from the victim's blood card and placed them in a separate envelope that she labeled Exhibit 10-A. The swabs and blood standard were ultimately sent to Bode Technology Group (Bode) for analysis.

¶ 32    On March 26, 2008, Sullivan received defendant's buccal swab. She then performed a DNA analysis on the swab and developed a DNA profile from it for defendant, which she then sent to Cellmark along with (1) Bode's original data from the swabs of the gloves, (2) a profile that Bode had developed from the swabs of the gloves, and (3) Walter's original blood standard.

¶ 33    Sullivan also did an analysis of the gloves for the presence of bloodstains, and they tested positive for the presence of blood. She then removed a portion of that stain so a DNA analysis could be performed on it. She developed a profile from the bloodstain and compared it to the DNA profile for Walter that Bode had developed from Walter's original blood standard. Sullivan interpreted the data and concluded with a reasonable degree of scientific certainty that the DNA profile which she had recovered from the bloodstain matched Walter's DNA profile.

[4]Worthem did not provide a first name for the ASA.

[5]Worthem's testimony was later contradicted by the testimony of Katherine Sullivan, one of the State's experts, who testified that the blood appeared to be only from the victim. Although the defense flagged this contradiction in its brief to this court, the State did not try to explain it away.

The DNA profile from the bloodstain on the glove would be expected to occur in approximately 1 in 610 quadrillion blacks, 1 in 15 quadrillion Hispanics or 1 in 5.9 quadrillion white unrelated individuals. The bloodstain appeared to have originated from the outside of the glove, because it was visible from both sides but covered more area on the outside of the fabric than on the inside.

¶ 34    On cross-examination, Sullivan testified that, prior to 2006, she had received additional standards from Quinten Campbell, Edward Bell, and Calvin Truitt, which she submitted to Cellmark for comparison. Further, the result from the bloodstain on the glove appeared to be from a single contributor, since there was no evidence of a mixture of multiple contributors.[6] Where there is a mixture, the order of the contributors cannot be determined.

¶ 35    The parties stipulated that, if called to testify, Abby Mulkenez would be accepted as an expert in forensic DNA analysis. She would testify that from May 24, 2005, through August 11, 2005, she was a DNA analyst for Bode Technology Group, Inc., and that Bode was a subcontractor for the Illinois State Police Forensic Sciences Command performing forensic DNA analysis. On May 24, 2005, Bode received Exhibits 1-A and 10-A from the Illinois State Police in Joliet. These exhibits were processed for DNA typing and for analysis of the 13 CODIS Short Tandem Repeat Loci. Exhibit 1-A contained a mixture of multiple donors, while Exhibit 10-A produced a complete profile of Walter Pinianski, the victim. Walter was not one of the contributors to the profile obtained from Exhibit 1-A. Although this was not stated in the stipulation, we observe that Exhibit 1-A contained the swabs from the inside of the glove prepared by Sullivan and that Exhibit 10-A was the victim's blood standard also prepared by Sullivan.

¶ 36    The State's next witness was Dr. Rick Staub, whom the parties stipulated was an expert in the field of forensic DNA analysis. Dr. Staub testified that he was employed as the laboratory director of scientific operations at Cellmark in Dallas, Texas, which did contract work for the Illinois State Police. The Illinois State Police asked Cellmark to compare: (1) Bode's data concerning an unknown DNA sample and (2) a known DNA profile developed by the Illinois State Police for defendant. Thus, when reviewing Bode's data to determine whether it revealed a major profile and, if so, what the major profile was, Dr. Staub already had in front of him defendant's profile. When asked whether it was common among experts in the field of DNA analysis to refer to and rely on other experts' data, he replied that it was "not uncommon."

¶ 37    Dr. Staub did not perform any tests on the items, and only interpreted the data generated by Bode and the Illinois State Police. According to Dr. Staub, the unknown sample from Bode contained a mixture of multiple individuals, but he believed he was able to identify a major contributor. As part of his review, he looked at an electropherogram which he explained is a chart with peaks and lows that looks comparable to an EKG. This chart is generated by "a laser detection instrument that runs the sample through a very thin glass capillary. When it comes

---

[6]As we previously observed, Sullivan's testimony that the blood found on the glove came from a single contributor, that the blood was from the victim and that the blood originated from the outside of the glove contradicted Worthem's videotaped statement that defendant told him that defendant hurt his hand when he broke the window and that he was bleeding inside the glove.

out at the end, a laser light hits the sample through the window and the DNA molecules have fluorescent tags on them that then will light up." Dr. Staub explained that "every time we see a peak [on the chart] that's where a DNA fragment has come through the instrument."

¶ 38　　Dr. Staub testified that he was aware that the unknown sample came from swabs from a pair of gloves, and that the known profile came from defendant's buccal swab. The known profile was very clear because it was a "single source profile." Dr. Staub opined that the standard from defendant matched the major profile from the gloves with a reasonable degree of scientific certainty. In his opinion, the statistical probability of a match between the major profile and a random individual was only 1 in 196.6 quadrillion.

¶ 39　　On cross-examination, Dr. Staub explained that the test he performed was called short tandem repeats (STR), which refers to areas of DNA in which there are small molecule combinations that repeat a certain number of times. The numbers on an electropherogram represent the number of repeats, and the number of repeats differs from person to person. At each location, a person inherits one number from his mother, and one number from his father. Sometimes, the electropherogram shows just one number at a certain location, which indicates the person inherited the same allele from both parents at that locus. When a sample shows more than two numbers at one of the locations on the electropherogram, it indicates a mixture of DNA. However, when the peaks on the electropherogram have a certain mathematical proportion to each other, it is possible to say that they go together. Sometimes, it is possible to determine a major profile from a minor profile, as evidenced by the peak heights on the electropherogram. Dr. Staub agreed with Bode's conclusion that there were at least three contributors to the unknown sample from the glove.

¶ 40　　Dr. Staub acknowledged that the profile determined by the Illinois State Police did not agree with his profile at one locus.

¶ 41　　Dr. Staub was shown defendant's Exhibit 1, which he identified as the electropherogram showing Bode's results from the "profiler plus" test on the swabs from the gloves; and defendant's Exhibit 2, which he identified as the electropherogram showing Bode's results from the "cofiler" test. The "profiler plus" test reveals nine loci, plus gender; while the cofiler test reveals six loci. Two of the loci from the cofiler test overlap with two of the loci from the profiler test, yielding a total of thirteen loci. Each locus has a different name. For example, the first locus, which appears on the top left of defendant's Exhibit 1, is called D-3, and Dr. Staub circled it and labeled it. He also circled and labeled the locus called D-13. For D-3, Dr. Staub testified that two peaks were very high, as compared to three much smaller peaks. Turning to D-13, Dr. Staub testified that the chart showed three peaks, which were labeled 11, 12 and 13. Dr. Staub concluded that the peaks labeled 11 and 13 were the major contributor. Dr. Staub further testified that, although the peak labeled 12 was smaller, it was not nearly as small as the small peaks in D-3.

¶ 42　　Dr. Staub explained that, since the 12 was between the 11 and the 13, the 12 peak could be accounted for by a "phenomenon called stutter." Dr. Staub concluded that "often times when you have a peak between two other peaks, it is even emphasized even more." However, Dr. Staub testified that the same phenomenon could also account for the height of the eleventh peak, which he had concluded was part of the major profile.

¶ 43 Dr. Staub concluded that his "feeling was that the most likely major profile [at D-13] was an 11, 13." He testified that he did not perform any mathematical calculations with regard to the peak heights. He testified that "just by looking at it, and rationalizing it, I determined that." Dr. Staub admitted that "[g]enerally, there is a mathematical relationship."

¶ 44 Dr. Staub also testified that he had not reviewed any of the lab validation from Bode for the purpose of this case analysis; that there will be variances from instrument to instrument; and that there will be certain peak height differences from instrument to instrument within one lab and from lab to lab.

¶ 45 Dr. Staub was then shown defense Exhibit 2, which was the chart showing the results from the cofiler test, and he circled and labeled D-3 on the top left of the chart. D-3 was one of the loci that appeared on both charts. Dr. Staub then circled and labeled T-POX, which was located at the center of defense Exhibit 2.

¶ 46 Dr. Staub acknowledged that, at T-POX, Bode concluded that only the peak labeled 9 belonged to the major contributor. Dr. Staub disagreed with Bode's conclusion and concluded that both the peaks labeled 9 and 11 belonged to the major contributor. When asked whether he had mathematically calculated the ratios between the peak heights, he stated that he "may have done it like in passing," but he testified that he did not "have those documented." Dr. Staub relied on Bode's electropherogram, but not on its interpretation.

¶ 47 Dr. Staub testified that he was familiar with the concept of coincidental matches and he was familiar with the study that determined that loci in DNA profiles of different individuals will coincide at 9, 10 and even 11 loci. Also he could not determine, with respect to major and minor contributors, when a particular contribution was added to a sample. Thus, he could not determine whether the major contributor was the first or last contributor.

¶ 48 On redirect examination, Dr. Staub testified that he was asked to compare the unknown sample from the swabs of the gloves to the known profile developed by the Illinois State Police from defendant's buccal swab. His interpretation of locus D-13 was that 11 and 13 constituted the major profile. When he reviewed defendant's DNA profile at locus D-13, the alleles were also 11 and 13. In addition, it was his opinion that the profile developed from defendant's buccal swab coincided with what he found to be the major profile at 13 loci. Thus, he believed defendant's DNA profile to be a match.

¶ 49 On recross, Dr. Staub testified that, when he was determining the major profile from the unknown sample, he had the results for defendant's DNA profile.

¶ 50 The State rested, and the defense moved for a directed finding, which was denied.

¶ 51                                    B. The Defense's Evidence

¶ 52 The defense then called Dr. Karl Reich, the chief scientific officer of Independent Forensics Laboratory in Hillside, Illinois, who the parties stipulated was an expert in DNA testing. Dr. Reich testified that he was asked to review the DNA mixture obtained from the swabs of the gloves in this case. He explained that mixture interpretation is "quite complicated" for several reasons. First, the reagents used to develop a DNA profile were originally developed for the analysis of a single source, so "the original intent" for this type of

analysis was only to analyze DNA material from a single source. Second, the number of contributors adds to the complexity. Third, the amounts of DNA material contributed to the mixture by the different individuals can vary. Fourth, the different contributors may share common alleles at a particular locus, which can cause the peaks on the electropherogram for that locus to be higher.

¶ 53    In this case, Dr. Reich reviewed reports from Bode, the Illinois State Police and Cellmark, which each provided different interpretations of the same electropherogram. Although they were looking at the same electropherogram, each lab made its own determinations concerning the major and minor contributors.

¶ 54    Dr. Reich testified that, with respect to the D-13 locus, Bode concluded that the 11 peak and the 13 peak on the chart were both from the major contributor, and the 12 peak was from a minor contributor. By contrast, with respect to the same D-13 locus, the Illinois State Police concluded that it was not possible to resolve whether the 11, 12 and 13 peaks belonged to a major or minor contributor. When it is not possible to resolve a mixture, such as this one, with three alleles at one locus, there are at least six possible options for a major contributor at that locus: (1) 11, 12; (2) 11, 13; (3) 11, 11; (4) 12, 13; (5) 12, 12; and (6) 13,13.

¶ 55    With respect to the T-POX locus, Dr. Reich testified that Bode concluded that only the 9 peak was from the major contributor and that the 8, 10 and 11 peaks were from minor contributors. By contrast, with respect to the same T-POX locus, the Illinois State Police concluded that both the 9 and 11 peaks were from the major contributor. Dr. Staub agreed with Bode with respect to the D-13 locus but disagreed with them with respect to the T-POX locus; and he agreed with the Illinois State Police with respect to the T-POX locus but disagreed with them with respect to the D-13 locus. Dr. Staub's agreements and disagreements aligned with defendant's profile.

¶ 56    Dr. Reich testified that he was familiar with the concept of coincidental matches, which referred to "the demonstrated ability" of nonrelated individuals to have DNA profiles that coincide at 9, 10 or 11 loci. This concept affects how the results shown on the electropherogram can be interpreted in this case. Dr. Reich explained:

> "Because there are two loci, *** T-POX and D-13, that have at least two possible interpretations maybe three, *** that the final decision as to what the major profile might be, has some ambiguity and that ambiguity coupled with the understanding that non-related individuals can match at high numbers of alleles *** introduces much more doubt into *** one of the final conclusions that has been reached.
>
> * * *
>
> Any alteration from the profile of an individual will exclude that profile as identifying that person. So, a full profile of 13 loci under current scientific conclusions is sufficient to identify one person from all others. That profile has a number of results. An alteration of even one of those results, excludes that individual from being that contributor. Even one allele out of the whole thirteen."

When asked whether, in light of the possible alternate profiles put forth by Bode and the Illinois State Police, the case presented profiles that would not match defendant, Dr. Reich replied: "Absolutely."

¶ 57 Dr. Reich further testified that it is impossible to determine the order of contributors to a mixture, even when the major and minor contributors can be determined. He explained:

> "The major and minor contributor refer exclusively to the rough approximation of how much nucleic acid of each the contributors might have added into the sample. They do not speak to the timing or the order of any of the body fluids or skin cells that were added to the evidentiary item."

¶ 58 On cross-examination, the State asked Dr. Reich, locus by locus, whether the alleles listed in defendant's profile appeared anywhere on the electropherogram, without regard to whether they were from the major or minor contributors. For each question, the State asked simply "do you see" the alleles on the chart. The State did not ask him to interpret or explain what he could "see." The defense objected to this line of questioning as "misleading" and "improper" and was overruled both times. When Dr. Reich tried to answer in scientific terms, the prosecutor told him to answer just yes or no, and the defense objected but it was overruled. Later, the prosecutor stated: "I am going to strike that [answer], because there is no question pending. Doctor, when I ask you a question answer it. Don't volunteer any information." However, the trial court overruled the prosecutor's statement and let that particular answer stand, which was that the 11 peak at the T-POX locus from the unknown sample was from the minor contributor, while defendant's profile was both 9 and 11 at the T-POX location.

¶ 59 On redirect, Dr. Reich testified that the State had not asked him about which alleles belonged to the minor contributors and that, if one changed one's interpretation of what constituted the major profile, it could include or exclude other profiles. On recross, Dr. Reich testified that defendant could not be excluded.

¶ 60 The defense moved to admit into evidence defendant's Exhibits 1 and 2, which were the electropherograms for the swabs of the gloves, and they were admitted. Defendant was admonished by the trial court concerning his right to testify, and the defense rested.

¶ 61 C. State's Rebuttal Evidence

¶ 62 The State called Dr. Staub in rebuttal who testified that he had made some mathematical calculations while Dr. Reich was testifying. He testified that, if you added up "the peak heights at each locus, [for] what I'm calling the major contributor," then the major contributor accounts for "anywhere from 75 to 85 percent of the total DNA." With respect to the D-13 locus, if the alleles for the major contributor were 11, 11, then the major contributor would be contributing only 39% at that locus, and if the alleles were 11, 12, then he would be contributing only 62%. However, Dr. Staub failed to provide the percentage for an 11, 13, which is what he believed were the alleles from the major contributor at that locus, so the record is silent on whether this percentage fell within the 75% to 85% range that he had delineated.

¶ 63    Dr. Staub testified that, with respect to the T-POX locus, that a 9, 9 or an 11, 11 "would not make sense" because they would "come[ ] out to maybe 58% or 28% of the total." By contrast, "if he is 9, 11, which I called, he is 86%." However, Bode determined that the minor contributors included not only an 11, but also an 8 and a 10, and Dr. Staub provided no percentages for a 9, 8, or a 9, 10. Thus, the record is silent as to whether the percentages for a 9, 8, or a 9, 10 would have also fallen into the percentage range that Dr. Staub delineated. A profile with these combinations would have excluded defendant.

¶ 64                              II. Trial Court's Findings

¶ 65    At the conclusion of the bench trial, the trial court made the following findings. A horrendous crime had been committed against an 82-year-old man in his home when someone broke in and stabbed him to death. The victim was in the habit of keeping money in his house and had been to the bank shortly before the crime. The perpetrator had entered the victim's residence through a basement window, and then had come up the stairs, where he encountered the victim and stabbed him and left him on the kitchen floor. The victim's entire residence was ransacked and the phone lines had been cut. Much of the evidence in this case "revolves around a pair of gloves" recovered from the crime scene. The gloves had patterns on them that matched the prints found on the PVC pipe and the washing machine underneath the broken basement window. The gloves had the victim's blood on the outer surface, which indicated that "the person wearing those gloves was involved in the bloodying of the victim which lead [*sic*] to his death." Expert witnesses from both sides agreed that DNA material from at least three people was found on the inside of the gloves. The trial court then stated:

> "[Dr.] Staub testified on behalf of the State that the major contributor of the DNA, above all other individuals who at some point may have wore these gloves, was a standard which matched the defendant, unquestionably.
>
> The defendant refuted him through Dr. Reich. However, regardless of all, Dr. Reich did, through laborious cross examination, have to indicate that certainly it was still the defendant, who through every standard taken, was one of the individuals whose DNA was on those gloves, though he disputes whether or not he was a major contributor.
>
> * * *
>
> There is no question by the Court that he was a contributor of DNA to those gloves. [Dr.] Staub did testify that he was a major contributor, by the evidence that I have. Furthermore, in this case, it certainly does support Dr. Staub's finding, that evidence which the Court looks at is the testimony of the State's jailhouse witness."

¶ 66    The trial court then found that the testimony of Worthem "must be viewed with extreme caution." Worthem was a convicted felon, and serving time in IDOC. He was aware that if he cooperated, he could receive a deal from the State. Therefore, he "probably would do anything to have that happen." However, Worthem's testimony provided information that coincided with the evidence presented and explained other questionable facts in this case:

- 13 -

"[Worthem] testified that the defendant admitted during the course of their conversation that he entered Mr. Pinianski's house through breaking in a window, as the evidence technician's evidence indicates.

He indicates that the defendant talked about leaving a glove, or gloves, there, which we do have gloves which ultimately the DNA establishes the defendant had been wearing. During these conversations defendant also admitted [to] taking property from the victim after [he] stabbed him numerous times, as he indicated like stabbing a cushion with a knife that the defendant had."

¶ 67    The trial court concluded that the facts presented by Worthem's testimony were "so similar to other evidence here, they become more than just coincidences and they come to a point where the Court has to look at them as they are corroborating other evidence and find, in fact, that certainly there is only one person who this information could have come from, and that is the defendant."

¶ 68    Based on these findings, the trial court found defendant guilty on March 14, 2011, of first degree murder, home invasion, and armed robbery. On April 11, 2011, defendant moved for a new trial, which was denied. After hearing factors of aggravation and mitigation, the trial court sentenced defendant to 80 years for first degree murder, 20 years for home invasion, and 20 years for armed robbery, with all sentences running consecutively. Defendant then filed a motion to reconsider the sentence, which was also denied. This appeal followed.

¶ 69                                                    ANALYSIS

¶ 70    On this direct appeal, defendant claims that he was denied due process of law when the trial court based its finding of guilt at his bench trial on a mistake in recalling the testimony of defendant's sole witness. In support, defendant relies primarily on two cases: *People v. Mitchell*, 152 Ill. 2d 274 (1992); and *People v. Bowie*, 36 Ill. App. 3d 177 (1976). The State does not discuss or cite these cases in its brief to this court, nor does the State make any attempt to distinguish the facts of these cases from the facts in the case at bar.

¶ 71    Instead, the State treats defendant's claim as a claim of insufficient evidence, and also argues that defendant has waived this issue by failing to object at trial and in a posttrial motion. First, as we discuss in more detail below, a claim of insufficient evidence is different from a claim that a trial court affirmatively made a mistake in its decision-making process. Second, a claim of insufficient evidence is not waived even if defendant does not raise it in the court below. *People v. Enoch*, 122 Ill. 2d 176, 190 (1988) (holding that the doctrine of waiver does not apply when a defendant challenges the sufficiency of the evidence).

¶ 72    The State also argues that the trial court's recollection was not faulty, because the defense expert's statement that defendant could not be excluded is *the same as* concluding that "certainly it was" defendant. However, there is an exponential difference between a conclusion that someone could not be excluded based on a consideration of some loci, and a certain identification based on a full 13-loci match. *People v. Wright*, 2012 IL App (1st) 073106, ¶¶ 82-84, 101.

- 14 -

¶ 73        For the following reasons, we reverse and remand for a new trial.

¶ 74                                    I. Standard of Review

¶ 75        Our supreme court has held that the failure of the trial court to recall and consider evidence that is crucial to a criminal defendant's defense is a denial of the defendant's due process. *People v. Mitchell*, 152 Ill. 2d 274, 323 (1992); see also *People v. Simon*, 2011 IL App (1st) 091197, ¶ 91; *People v. Carodine*, 374 Ill. App. 3d 16, 28-29 (2007); *People v. Morgan*, 44 Ill. App. 3d 730, 734 (1976) (conviction reversed where the trial court failed to recall defendant's witnesses); *People v. Bowie*, 36 Ill. App. 3d 177, 180 (1976) (conviction reversed where the trial court failed to recall crucial evidence of the defense). A trial judge sitting as a trier of fact must consider all the matters in the record before deciding the case. *People v. Bowen*, 241 Ill. App. 3d 608, 624 (1993); *Bowie*, 36 Ill. App. 3d at 180. Where the record affirmatively shows that the trial court failed to recall crucial defense evidence when entering judgment, the defendant did not receive a fair trial. *Simon*, 2011 IL App (1st) 091197, ¶ 91; *Bowen*, 241 Ill. App. 3d at 624; *Bowie*, 36 Ill. App. 3d at 180. Whether a defendant's due process rights have been denied is an issue of law and, thus, our review is *de novo*. *People v. K.S.*, 387 Ill. App. 3d 570, 573 (2008). Under the *de novo* standard of review, this court owes no deference to the trial court. *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 154 (2007).

¶ 76        While a question of law is decided *de novo*, a trial court's credibility determinations are entitled to great deference, and they will rarely be disturbed on appeal. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009); *Bowie*, 36 Ill. App. 3d at 179. In a bench trial, it is the job of the trial judge, sitting as the fact finder, to make determinations about witness credibility. *Siguenza-Brito*, 235 Ill. 2d at 228; *Bowie*, 36 Ill. App. 3d at 179.

¶ 77        In the case at bar, the trial court made a credibility determination about the jailhouse informant, finding that his testimony "must be viewed with extreme caution" and that the court would use it merely as "corroborating [the] other evidence." The trial court's conclusion that Worthem's testimony must be viewed with suspicion is well supported by the record. Worthem was a self-described jailhouse lawyer who had struck deals before in return for information, and parts of his testimony contradicted the record. For example, in his videotaped statement, Worthem mentioned that defendant told him that defendant hurt his hand when he broke the window and that he was bleeding inside the glove. However, one of the State's experts testified that the blood originated from the outside of the glove and that this blood belonged only to the victim. Thus, the trial court described the informant's testimony only as evidence that "support[s] Dr. Staub's finding." As the trial court itself observed, the only other evidence was the DNA evidence.

¶ 78        As for the DNA evidence, the trial court could have made a credibility determination between the dueling DNA experts, finding one more credible than the other. However, it did not do so. In fact, the trial court found: "The defense refuted [Dr. Staub] through Dr. Reich." Instead, the trial court mistakenly recalled the defense expert as agreeing with the State expert on the ultimate issue: that "certainly it was" defendant. Due to the trial court's mistaken recollection, there was hardly any credibility determination for it to resolve between the two

- 15 -

testifying experts. *Cf. Mitchell*, 152 Ill. 2d at 323 (rejecting the State's argument that the trial court did not find a witness credible where the trial court never said that).

¶ 79 In sum, with respect to the standard of review, we will review *de novo* the legal question of whether defendant's due process rights were denied, while deferring to the trial court's credibility determination that the jailhouse informant's testimony was merely corroborative.

¶ 80 II. Mistaken Recall of the Evidence

¶ 81 As noted above, in the case at bar, defendant relies primarily on *People v. Mitchell*, 152 Ill. 2d 274 (1992), and *People v. Bowie*, 36 Ill. App. 3d 177, 180 (1976). In *Mitchell*, our supreme court stated: "We find the trial court's failure to recall defendant's testimony [is] a violation of defendant's due process rights and error." *Mitchell*, 152 Ill. 2d at 321. In *Bowie*, this court held that the defendant did not receive a fair trial because the trial judge did not remember or consider the crux of the defense when entering judgment. *Bowie*, 36 Ill. App. 3d at 180. See also *People v. White*, 183 Ill. App. 3d 838, 841 (1989) ("the trial judge erred in considering facts not in evidence," and "[g]iven that fact and the overall weight of the evidence, we cannot find that the error was harmless and must therefore reverse the trial court's decision").

¶ 82 The error in *Mitchell* occurred at a pretrial suppression hearing rather than at trial. The issue was whether the defendant was free to leave an interrogation at the police station. The defendant testified that, prior to the interrogation, when he and the officers were standing outside his home, he told the officers that he wanted to go back inside to dress in warmer clothes. The defendant testified that the officers refused to let him go and "drag[ged]" him into the police vehicle and that, after arriving at the police station, one of the officers told him: " 'We [are] not going to let you go until we get what we want out of you.' " *Mitchell*, 152 Ill. 2d at 306. At the end of the suppression hearing, the trial court denied the defendant's motion to suppress his confession, stating: "There was no testimony that I recall that said the defendant at any time said he felt he could not leave, or that he was asked–or that he asked whether he could leave and denied that permission." (Internal quotation marks omitted.) *Mitchell*, 152 Ill. 2d at 307.

¶ 83 In *Mitchell*, the State argued, first, "that the trial court did not base its findings solely on the absence of such testimony." *Mitchell*, 152 Ill. 2d at 323. Our supreme court rejected this argument, stating: "the trial court clearly did not base its decision on all of the circumstances, as it failed to recall the testimony most crucial to defendant's argument." *Mitchell*, 152 Ill. 2d at 323.

¶ 84 The State argued, second, that the trial court simply did not find the defendant credible. *Mitchell*, 152 Ill. 2d at 323.[7] Rejecting this second argument, the supreme court stated that the trial court never "state[d] that defendant was not a credible witness." *Mitchell*, 152 Ill. 2d at 323. The supreme court observed: "The State's argument rests upon the fact that the [trial]

[7]The supreme court in *Mitchell* also rejected defendant's waiver argument, which we discuss below in section IV of this opinion. *Mitchell*, 152 Ill. 2d at 324-26.

court found against defendant. However, while the court found against defendant, it also failed to recall the crux of defendant's testimony in doing so." *Mitchell*, 152 Ill. 2d at 323.[8]

¶ 85     Similar to *Mitchell*, the trial court in the case at bar recalled the opposite of what was stated. The trial court recalled the defense expert as saying that "certainly it was" defendant, when the defense expert emphasized repeatedly and throughout his testimony that certainty was not possible. As in *Mitchell*, the State argues here that the trial court did not base its verdict solely on this error. Like our supreme court, we reject this argument, since "the trial court clearly did not base its decision on all of the circumstances, as it failed to recall the testimony most crucial to defendant's argument." *Mitchell*, 152 Ill. 2d at 323. As in *Mitchell*, the State argues here that the trial court simply found the witness less credible. Like our supreme court, we reject this argument, since the trial court never stated that the defense witness "was not a credible witness" or that the State expert was more credible. *Mitchell*, 152 Ill. 2d at 323. In fact, the trial court's reliance on what it perceived to be the defense expert's testimony showed that the trial court did, in fact, find him to be a credible witness.

¶ 86     Like our supreme court did in *Mitchell* and for the same reasons, we find that the trial court's failure to recall crucial testimony from the only defense witness was a due process violation.

¶ 87     Our conclusion is bolstered by our consideration of *Bowie*, in which this court held that the defendant did not receive a fair trial because the trial judge did not recall the crux of the defense case when entering judgment. *Bowie*, 36 Ill. App. 3d at 180.

¶ 88     *Bowie* involved a bench trial in which the defendant was accused of hitting a police officer. *Bowie*, 36 Ill. App. 3d at 178-79. The main issue was who hit whom first. *Bowie*, 36 Ill. App. 3d at 179. On that issue, the defendant testified: " '[the police officer] had a tight grip on my arm and I told him that it wasn't necessary, that I wasn't going anywhere and he said, I don't tell him what to do, and *he hit me up beside my head and I grabbed my head and blood started rushing down and he hit me again.*' " (Emphasis in original.) *Bowie*, 36 Ill. App. 3d at 180. During closing argument, defense counsel stated that the defendant testified he was bleeding, and the trial court interjected: " '*I didn't hear that. I heard nothing about that the defendant stating anything about that he was bleeding*, strike that out.' " (Emphasis in original.) *Bowie*, 36 Ill. App. 3d at 180. This court held that the trial court's statement constituted affirmative evidence that it "did not remember or consider the crux of the defense when entering judgment." *Bowie*, 36 Ill. App. 3d at 180. As a result, we reversed and remanded for a new trial. *Bowie*, 36 Ill. App. 3d at 180.

¶ 89     The facts of our case present an even stronger case for reversal than the facts of *Bowie*. In *Bowie*, the mistakenly recalled evidence concerned whether the defendant was bleeding, which was not the main issue in the case. As stated above, the main issue in *Bowie* was who hit whom first. Whether the defendant hit the officer first, or the officer hit the defendant first, the *Bowie*

---

[8]The *Mitchell* court held that, even if one reversed the outcome of the proceeding in which the error occurred and suppressed the confession at trial, the other evidence at trial was "so overwhelming" as to make the due process violation harmless. *Mitchell*, 152 Ill. 2d at 326. We discuss harmless error in the next section of this opinion.

defendant could still have ended up bleeding. Thus, whether the defendant bled was neither the main issue in the *Bowie* case nor a fact that would prove the main issue. However, the appellate court still found that the trial court's statement constituted affirmative evidence that it failed to consider "the crux" of the defendant's case, where the defendant's testimony about bleeding was part of the same sentence that the officer hit him first. *Bowie*, 36 Ill. App. 3d at 180. Also, the appellate court found the trial court's statement to be affirmative evidence that the court failed to consider evidence "when entering judgment," even though the statement occurred during closing argument and not during the trial court's statement of its findings and reasons for its judgment. *Bowie*, 36 Ill. App. 3d at 180.

¶ 90    The facts of our case present an even stronger case for reversal than the facts of *Bowie* because, first, the mistakenly recalled fact concerned the primary issue in the case: was it "certainly" defendant who committed the crime? Second, the mistakenly recalled fact occurred during the trial court's ruling so we know that it was actually a part of its decision-making process.

¶ 91    Thus, pursuant to *Mitchell* and *Bowie*, we find that a due process violation occurred, and we proceed in the next section to determine whether this error was harmless.

¶ 92                                III. Harmless Error

¶ 93    After finding a due process violation, an appellate court must still consider whether the violation was harmless. *Mitchell*, 152 Ill. 2d at 326. Even due process violations are subject to a harmless error review. *Mitchell*, 152 Ill. 2d at 326. However, we may affirm only if, after considering all the other evidence, we can find that the error was harmless beyond a reasonable doubt. *White*, 183 Ill. App. 3d at 841 (conviction must be reversed where the trial court's error in considering facts not in evidence was not harmless, in light of "the overall weight of the evidence"). An error is harmless only if the State can demonstrate, beyond a reasonable doubt, that the error did not contribute to the verdict. *People v. Patterson*, 217 Ill. 2d 407, 428 (2005) ("The State bears the burden of proof."). In the case at bar, the State has failed to demonstrate, beyond a reasonable doubt, that the error did not contribute to the verdict.

¶ 94    As noted above, the only issue at trial was one of identification. There were no eyewitnesses, and defendant was not arrested at the crime scene but, rather, was arrested three years after the offense. No one testified that he had observed defendant in the neighborhood at any time, either before or after the offense, and there was no statement by defendant to the police.

¶ 95    The State's identification evidence consisted solely of: (1) DNA evidence; and (2) the testimony of a jailhouse informant. The trial court found that the informant's testimony "must be viewed with extreme caution" and that it was merely "corroborati[ve] [of the] other evidence." As stated above, this conclusion is well supported by the record, and we will not disturb the trial court's credibility determination.

¶ 96    The only other identification evidence was the DNA evidence obtained from a pair of bloody gloves found in the victim's home. Although the blood was solely from the victim, a swab of the inside of the gloves revealed additional DNA material.

¶ 97    All the experts in this case agreed that the DNA material at issue was a mixture of DNA from at least three individuals, maybe more. The defense expert testified the mixture revealed six possible DNA profiles. Thus, at least three people had worn those gloves, and both the State and defense experts agreed that, with a mixture, the order of contributors cannot be determined. All three laboratories engaged by the State in this case–the Illinois State Police, Bode and Cellmark–disagreed on how to interpret the results of the mixture. Although acknowledging his disagreement with the other laboratories, Dr. Staub of Cellmark testified that he was nonetheless able to identify a major contributor that matched defendant's profile.

¶ 98    While the trial court could have resolved the dispute between Dr. Staub and Dr. Reich, the defense expert, by finding Dr. Staub more credible, the court was not so persuaded. Instead, the trial court found defendant guilty by mistakenly recalling that Dr. Reich agreed with Dr. Staub on the most important question before the court: "certainly it was" defendant. We cannot find that a mistake concerning the most important question facing the trial court was harmless beyond a reasonable doubt.

¶ 99                         IV. State's and Dissent's Arguments

¶ 100   As a final matter, we address the State's main arguments: that this is really a claim of insufficient evidence and that defendant waived the issue.

¶ 101   First, the State treats defendant's claim of mistaken recall as merely a claim of insufficient evidence, although they are very different claims, subject to completely different standards of review.

¶ 102   When reviewing a claim of insufficient evidence in a bench trial, we presume that the trial court accurately recalled and considered all the evidence. *Simon*, 2011 IL App (1st) 091197, ¶ 91 (we presume, in a bench trial, that the trial court "considered only competent evidence in reaching its verdict"); *Mitchell*, 152 Ill. 2d at 323 (the trial court must consider "all of the circumstances"); *Bowie*, 36 Ill. App. 3d at 180 ("the trial judge must consider all the matters in the record before deciding the case"). As a result, its determination is entitled to a great deal of deference on appeal. We will not reverse its determination unless, after viewing the evidence in the light most favorable to the State, we find that no rational trier of fact could have reached the same conclusion as the trial court. *People v. Baskerville*, 2012 IL 111056, ¶ 31.

¶ 103   By contrast, with a claim of mistaken recall, the record contains affirmative evidence that the trial court made a mistake in its decision-making process, thereby undercutting the presumption that serves as the very foundation for the deferential standard of review in an insufficient evidence claim–that the trial court accurately recalled and considered all the evidence. *Simon*, 2011 IL App (1st) 091197, ¶ 91 (where a record contains affirmative evidence that the trial court did not accurately recall or consider crucial defense evidence when deciding judgment, defendant did not receive a fair trial); *Bowen*, 241 Ill. App. 3d at 624 ("where the record affirmatively shows the trial judge did not consider the crux of the defense when entering judgment, the defendant did not receive a fair trial"); *Bowie*, 36 Ill. App. 3d at 180 (same).

¶ 104    As a result, the claim of mistake must be reviewed under a completely different standard of review. Instead of the highly deferential standard applied to a trial court's ruling in an insufficient evidence claim, we review *de novo* the question of whether the record reveals that the trial court made an affirmative mistake in its decision-making process. *Cf. People v. K.S.*, 387 Ill. App. 3d 570, 573 (2008) (although "[a]trial court's decision on whether to limit discovery is reviewed for an abuse of discretion," we "review[ ] *de novo* whether a defendant was denied due process and, if so, whether that denial was prejudicial").

¶ 105    Thus, we are not persuaded by the State's treatment of defendant's claim as merely a claim of insufficient evidence.

¶ 106    Second, the State argues that defendant waived his claim by failing to object at trial and to raise it in a posttrial motion. *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007) (generally, to preserve error for review on appeal, a defendant must both object at trial and in a posttrial motion). Even if we accepted the State's waiver argument, it would not change our decision, because the error rises to the level of plain error. *Piatkowski*, 225 Ill. 2d at 565 (a defendant must show a clear error and that the error alone severely threatened to tip the scales of justice against him); *People v. White*, 2011 IL 109689, ¶ 133 (a defendant must show that the verdict may have resulted from the error and not the evidence). As we explained above, the evidence in the case at bar was not overwhelming, and this error could have been the piece of evidence that tipped the scales of justice against defendant.

¶ 107    However, we are not persuaded by the State's waiver argument for the same reasons that our supreme court rejected the identical argument in *Mitchell*. As stated above, in *Mitchell*, the trial court denied the defendant's suppression motion stating that it did not recall any testimony by the defendant that he was not free to leave, when the defendant had, in fact, testified that the police had dragged him to a police vehicle and told him at the police station that they were not going to let him go until they had obtained what they wanted. *Mitchell*, 152 Ill. 2d at 306-07. On appeal, the State argued that the defendant waived the issue when he failed to object during the trial court's ruling. *Mitchell*, 152 Ill. 2d at 306-07. The supreme court rejected this argument, stating "a defendant need not interrupt a trial court to correct a trial court's misapprehension, after defense counsel has just argued the same to the court." *Mitchell*, 152 Ill. 2d at 324. Similarly, in the case at bar, defense counsel had just argued, through Dr. Reich's testimony, that the DNA evidence was inconclusive and thus he was not required to interrupt the trial court to point out that the court was wrong. As a result, we do not find that the defense waived this claim by not objecting during trial.

¶ 108    The defense also did not waive this claim when it stated in its posttrial motion simply that "defendant was denied due process of law."[9] Similarly, in *Mitchell*, the defendant's posttrial motion contained only a general objection to the trial court's failure to suppress evidence, without specifying the trial court's mistaken recall of the evidence. *Mitchell*, 152 Ill. 2d at 325. Nonetheless, the supreme court rejected the State's claim of waiver, stating "[t]he trial court's

_____

[9]In its brief to this court, the State claims that the defense conceded in its brief that it failed to object both at trial and in a posttrial motion.  In fact, the defense made this concession only with respect to trial.

failure to recall crucial evidence is of the type of constitutional error which may be later raised in a post-conviction hearing, and we thus do not find the matter waived" by the defendant's failure to raise it with specificity in his posttrial motion. *Mitchell*, 152 Ill. 2d at 325. Thus, the defense did not waive this claim by not objecting during the trial court's ruling or with greater specificity in its posttrial motion.

¶ 109    The dissent contains a number of factual inaccuracies. However, we will address here only the most salient ones.

¶ 110    First, the dissent stated that, "although [Dr. Reich's] report criticized the ISP concerning the 11, 12 and 13 alleles at the D-13 locus for not conducting a search of the database that included all of the alleles, he acknowledged [on cross-examination] at trial that the ISP's search of 11, 12 and 13 actually did include all the alleles." *Infra* ¶ 130. That statement is factually incorrect. The dissent is confusing "alleles" with "profiles."

¶ 111    On direct examination, Dr. Reich explained that the ISP had found three peaks or alleles at the D-13 locus and had not been able to resolve which ones belonged to a major or minor contributor. When it is not possible to resolve a mixture, such as this one, with three alleles at one locus, there are at least six possible profiles for a major contributor at that locus: (1) 11, 12; (2) 11, 13; (3) 11, 11; (4) 12, 13; (5) 12, 12; and (6) 13, 13. On cross-examination, the prosecutor read from the portion of Dr. Reich's report in which Dr. Reich had criticized the Illinois State Police laboratory for not running a database search for all six profiles possible at that location. While Dr. Reich stated that all three alleles appeared on the Illinois State Police's report, he observed on cross-examination that the report did not indicate that a "wild card search" had been done at that location for all six possible profiles. Thus, the dissent's statement that he had acknowledged a search had been done is factually inaccurate.

¶ 112    Second, the dissent states that "Dr. Reich identified the alleles of defendant that were present at each one of the 13 separate loci." *Infra* ¶ 131. That statement is factually incorrect. Alleles come in pairs. For defendant's alleles to be present, the pair would have to be present at each location, as part of a particular contributor. In other words, if defendant's alleles at a location are 9 and 11, and there is a 9 from a major contributor and an 11 from a minor contributor at the same location, then those alleles cannot possibly come from defendant. One cannot take a 9 from one person and an 11 from another person to make a match, because defendant is only one person. Alleles from two different people can never be a match and to indicate that it can is patently incorrect.

¶ 113    What Dr. Reich was asked to do on cross-examination was to read numbers off a chart, as though it was an eye exam. He was asked to read the numbers, without any reference to pairs of alleles or whether a particular number belonged to a major or minor contributor. For example, the following exchange occurred during cross-examination:

"ASA: What about at T-POX, what is the defendant's alleles?

DR. REICH: Nine and 11.

ASA: And do you see 9 and 11 in the Bode chart?

DR. REICH: There is 9 and 11 in the Bode chart."

However, on direct examination, Dr. Reich explained that Bode concluded that only the 9 peak was from the major contributor, while the 8, 10 and 11 peaks were from minor contributors. Thus, for defendant's alleles to be present at the T-POX location, he would have to be two people–taking the 9 from the major contributor and the 11 from a minor contributor! Dr. Reich did not testify to that and, as a result, the dissent's statement that Dr. Reich identified "the alleles of defendant" as "present at each one of the 13 separate loci" is factually inaccurate.

¶ 114 It is significant that, in the portion of the testimony quoted by the dissent, the prosecutor asks Dr. Reich if "defendant's alleles" are present, and he answers only that "the alleles" are present, refusing to adopt the prosecutor's characterization of the alleles as "defendant's." On redirect examination, defense counsel clarified that Dr. Reich's statements on cross-examination were made without reference to major and minor contributors which could change the interpretation.

¶ 115 Third, the dissent emphasizes the "omission" in Dr. Reich's report, in that the report, prepared two years prior to trial, did not discuss the T-POX location. However, when asked about it on cross-examination, Dr. Reich testified that it was not in "this" two-year old report. When asked about it again, Dr. Reich reiterated that it was "not corrected" in the two-year old report, and the prosecutor failed to ask a follow-up question about whether it had since been "corrected" in another document. The lack of a follow-up question possibly explains why this alleged omission had no effect on the trial court's findings.

¶ 116 Fourth, the dissent's characterization of the defense's closing argument leads to the impression that the defense conceded the DNA issue. However, the defense began its argument with the observation that the DNA evidence was "inconclusive [as to] who was the major contributor." The defense then made arguments in the alternative that, even if one assumed that defendant had worn the glove, there was a mixture of three people and there was no way of knowing when he wore it or whether he was the last person. While there were other inaccuracies, we took the time here to address only the most significant.

¶ 117                                    V. Double Jeopardy

¶ 118 Since we are remanding this case for a new trial, we must consider whether another trial would violate the double jeopardy clause. *People v. Ward*, 2011 IL 108690, ¶ 50. If the totality of the evidence presented at defendant's first trial was sufficient for a rational trier of fact to find that the essential elements of the crime were proved beyond a reasonable doubt, then there is no double jeopardy violation on retrial. *Ward*, 2011 IL 108690, ¶ 50. As discussed above, the trial court was not so persuaded by the State's expert as to choose between the two experts and find the defense expert less credible. However, the State's evidence, if believed, was sufficient to establish defendant's guilt beyond a reasonable doubt. *Ward*, 2011 IL 108690, ¶ 50. Thus, there is no double jeopardy impediment to retrial here. *Ward*, 2011 IL 108690, ¶ 50.

¶ 119                                    CONCLUSION

¶ 120          For the foregoing reasons, we find that defendant's due process rights were violated and that the error was not harmless beyond a reasonable doubt. Thus, we must reverse and remand for a new trial.


¶ 121          Reversed and remanded.


¶ 122          JUSTICE LAMPKIN, dissenting.

¶ 123          I respectfully dissent and would affirm defendant's convictions. I do not agree with the majority's conclusion that the trial court based its finding of guilt on a mistaken recollection of Dr. Reich's testimony. Defendant has argued on appeal that the trial court incorrectly stated that Dr. Reich conceded that defendant's DNA was on the gloves and disputed only whether defendant was a major or minor contributor. Defendant asserts that Dr. Reich disputed whether the DNA evidence was sufficient to link defendant to the gloves at all. A review of the record establishes that the trial court's recollection of all the evidence, including Dr. Reich's testimony, was completely accurate.

¶ 124          Defendant acknowledges that he failed to object to the trial court's recollection of the testimony. Moreover, the record establishes that defendant failed to raise this specific issue in his posttrial motion. Defendant argues, however, that the rule of forfeiture is relaxed in this instance because an objection by the defense "would have fallen on deaf ears" and the defense "was not required to interrupt the trial court to repeat arguments that had just been made in closing." I do not agree with defendant's characterization of the defense's closing argument. According to the record, the defense did not argue that defendant's DNA profile was not found on the gloves but, rather, that at least two other people also wore the gloves and no evidence established beyond a reasonable doubt that defendant was the last person to wear the gloves during the murder. Moreover, at the hearing on defendant's motion for a new trial, the defense argued that the DNA mixture found in the gloves included two other people's DNA besides defendant's DNA and thus was not sufficient to prove his guilt of the crime beyond a reasonable doubt. Nevertheless, whether defendant's "mistaken recollection" argument is considered on the merits or under a plain error analysis, the first step is to determine whether error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). For the reasons that follow, I would find no error here to excuse defendant's forfeiture of this issue.

¶ 125          A trial court's failure to recall and consider testimony crucial to a defendant's defense may result in a denial of the defendant's due process rights. *People v. Mitchell*, 152 Ill. 2d 274, 323 (1992). In a bench trial, the trial court is presumed to have considered only competent evidence in reaching its verdict, unless that presumption is rebutted by affirmative evidence in the record. *People v. Gilbert*, 68 Ill. 2d 252, 258-59 (1977). Where the record affirmatively indicates that the trial court did not remember or consider the crux of the defense when entering judgment, the defendant did not receive a fair trial. *People v. Bowie*, 36 Ill. App. 3d 177, 180 (1976). In a bench trial, the trial court is not required to mention everything that contributed to its findings. *People v. Curtis*, 296 Ill. App. 3d 991, 1000 (1998). A reviewing court may take into account any facts in the record which support an affirmance of the trial

court's findings, even where the trial court does not explicitly state that it relied on those facts. *Id*.

¶ 126 Before conducting an analysis of this issue, an accurate summary of the relevant testimony and court proceedings is necessary. According to the record, Dr. Staub, the State's witness, testified that he deduced a major profile from the DNA mixture sample that had come from the gloves. At least three unknown individuals contributed to that DNA mixture. When Dr. Staub compared the reference standard that had come from defendant's buccal swab with the profile of the DNA mixture found in the gloves, Dr. Staub concluded that defendant's reference standard matched the major profile deduced from the DNA mixture. He determined that the statistical likelihood of the match was 1 in 196.6 quadrillion. Dr. Staub's conclusions agreed with the conclusions by Bode Laboratories except for one difference. Specifically, at the T-POX site, Bode called the 9 marker as a major contributor, but Dr. Staub called the 9 and 11 markers as a major contributor because it was very clear that the major profile was a very significant portion of the entire DNA in that sample and if it was not included, then the analysis would attribute too much of the rest of the DNA to the minor contributors. Moreover, the Illinois State Police (ISP) deduced a profile for search purposes, so at the D-13 locus, it had an additional allele in comparison to Dr. Staub's deduced profile. Concerning electropherograms and DNA mixture interpretations, high peaks at various loci indicated a major profile whereas other peaks indicated minor contributors. However, sometimes a minor contributor could share an allele with the major contributor and that potentially could make one of the taller peaks go even higher.

¶ 127 Dr. Staub was aware of a study that determined there could be coincidental matches in DNA database searches of up to 9, 10 or even 11 locations of profiles between individuals, but that study used a very different standard of methodology than a forensic database search, which finds a profile from a piece of evidence and compares it to the database. A forensic database search looks for one profile in a database, not any profile. When asked if he was aware that there could be coincidental matches between a deduced profile and an individual profile at 9, 10, 11 or more locations, Dr. Staub responded:

> "Well, you can actually determine the exact probability of that. In this particular case when there are 13 markers, the likelihood of a random match, is one in seven quadrillions. So, basically, for all intent and purposes, it means you won't find a match unless you actually have the same person."

Dr. Staub testified that when one looks at the 13 separate and distinct loci that are used to determine a DNA profile, the standard from defendant appeared at each one of the 13 loci that Dr. Staub had developed in his major profile. At every one of the 13 loci that Dr. Staub developed in his major profile, the defendant's DNA was an exact match.

¶ 128 For the defense, Dr. Reich testified that a full profile of 13 loci is sufficient under the scientific standard to identify one person from all others. However, DNA mixture interpretation can be complicated because multiple contributors can share common alleles at a particular locus. Dr. Reich stated that because the D-13 and T-POX loci here had at least two and maybe three possible interpretations, there was some ambiguity in the conclusions reached in the interpretations of Bode, the ISP, and Dr. Staub concerning the components of the major

profile. If a profile of 13 loci has a number of alternate results, then an alteration of even 1 allele out of the whole 13 would exclude that individual from being a contributor. Dr. Reich stated that the possibility of nonrelated individuals having DNA profiles that can match at up to 9, 10, or sometimes 11 loci casts further doubt on the conclusions reached in the interpretations of Bode, ISP and Dr. Staub. Dr. Reich asserted that the alternate interpretations by Bode, ISP and Dr. Staub concerning the D-13 and T-POX locations meant there was a possibility of there being alternate profiles that would match the major profile. Because there were at least three contributors to the mixed DNA sample found in the gloves, then at least three individuals left either body fluid or cells or both behind in the gloves. Defendant, however, could not be excluded from the DNA profile from the swab taken from the inside of the gloves.

¶ 129    Concerning the interpretations of the electropherogram by Bode, the ISP, and Dr. Staub, Dr. Reich noted that the ISP at the D-13 location did not distinguish 12 as a minor contributor and thus did not resolve the mixture at that location. Consequently, according to Dr. Reich, there were six possible profiles as the contributors, taking into account the opportunities for both homozygous and heterozygous results. Moreover, it was impossible to make any determination concerning the timing or order that each contributor made to the mixed DNA sample.

¶ 130    On cross-examination, Dr. Reich acknowledged that his report failed to mention the T-POX location. Furthermore, although his report criticized the ISP concerning the 11, 12 and 13 alleles at the D-13 locus for not conducting a search of the database that included all of the alleles, he acknowledged at trial that the ISP's search of 11, 12 and 13 actually did include all the alleles. He acknowledged that, aside from the D-13 and T-POX loci, he agreed with Dr. Staub's interpretation for the 11 remaining loci.

¶ 131    Initially, when the prosecutor asked if Dr. Reich would "agree with the statement that [defendant's] alleles appear at each one of the 13 separate loci that [were] tested," Dr. Reich responded that he "would say it a little differently." Consequently, the prosecutor questioned Dr. Reich concerning each one of the 13 sites, and Dr. Reich identified the alleles of defendant that were present at each one of the 13 separate loci. When the prosecutor again asked if "defendant's alleles are present at each one [of] the 13 loci," Dr. Reich responded:

"The scientific response is he is not excluded. That is the correct approach–***
That is the correct wording."

The prosecutor continued:

"Q. Doctor, listen to my question. It's [*sic*] calls for a simple look at each one of the charts. As we went through it, each one of the defendant's alleles are present in the Bode chart, correct?

A. Each one of the numbers is present on both charts.

Q. The numbers came from the electropherogram from the defendant's [DNA] standard, correct?

A. Correct.

Q. *So, the defendant's alleles are on each one of the 13 loci on the [DNA] profile determined by Bode, coming from the swabs of the gloves, correct?*

A. *The alleles are present, that is correct.*

Q. *Okay. And each of the 13 loci, correct?*

A. *We have gone through them one by one and they are, correct.*" (Emphases added.)

¶ 132    In the State's rebuttal case, Dr. Staub countered Dr. Reich's testimony that questioned Dr. Staub's interpretation that called the 11 and 13 markers at the D-13 location as the major profile. Specifically, Dr. Staub explained that Dr. Reich was incorrect in speculating that the major contributor could be a homozygous 11, 12 or 13. In adding up peak heights at each locus, Dr. Staub determined that the major contributor was 75% to 85% of the total DNA. Consequently, it would not make sense for the major contributor to be homozygous at any of the markers because then he would be contributing too low of a percentage to the total DNA. The same analysis held true for the T-POX location, where Dr. Staub called the 9 and 11 markers as the major profile, which was 86% of the total DNA. Bode's conclusion for D-13 was the same as Dr. Staub's. Moreover, ISP chose not to resolve the mixture at D-13 because it was searching the database for a profile and thus chose to be conservative and use the 11, 12 and 13 markers so ISP would not miss it. ISP's purpose to search for an individual in the database was completely different from Dr. Staub's purpose to try to identify someone by comparing defendant's known standard with the unknown standard.

¶ 133    According to the record, the experts testified on the same day and were the last witnesses to testify before the hearing concluded on a Friday. Instead of proceeding to closing argument, the trial court continued the matter to Monday afternoon so the trial court could review all its notes that were spread over a number of days.

¶ 134    At closing argument, the defense argued, *inter alia*, that the State was relying on sympathy for the victim to win this case and ignoring and avoiding the substandard circumstantial evidence that failed to connect defendant to this offense. The defense argued that the State was "hinging [its] case on the fact that [defendant's] DNA may possibly be connected to a piece of evidence that cannot be excluded, from an inside glove that was found inside of a house where [the victim] was found dead."

¶ 135    Concerning the DNA evidence, the defense argued that the experts agreed that the DNA taken from the glove was a mixture of at least three sources, so at least three people wore that glove at some point. The defense argued that the DNA evidence was inconclusive as to who was the major contributor at the D-13 and T-POX loci because the different labs that tested the DNA had different conclusions and it can be very complicated to determine who was the major or minor contributor to a DNA mixture. "[W]hile there may be doubts as to whether or not [defendant] is a major contributor at the D-13 and T-POX locations, there is no definitive evidence that either the major contributor of DNA or the minor contributor of that DNA committed that crime." Even if a person was determined to be a major contributor, it did not mean he owned the gloves or was the one that stabbed the victim because it was scientifically impossible to determine whether the major DNA contributor was the last person to have worn the gloves.

¶ 136    The defense argued that the State ignored all other leads and evidence once defendant was established as a potential DNA contributor to the mixture found in the gloves. No reliable evidence connected defendant to the crime because, although evidence showed that defendant and other people wore the gloves, there was no explanation as to how the gloves got in the victim's house, how defendant brought the gloves into the house, when defendant had the gloves on, or who else had the gloves on. "The only thing that you could plausibly take from this evidence, and it's still not proof beyond a reasonable doubt, is that at some point in his lifetime, [defendant] touched that glove."

¶ 137    The prosecutor argued, *inter alia*, that there was no question that the major profile in the DNA mixture found in the gloves was defendant's DNA. Although the defense had argued that defendant merely could not be excluded as a contributor, the evidence established that defendant's DNA was present at every one of the 13 loci tested in CODIS. Dr. Staub testified that defendant was the donor of the major profile in the gloves and that match could occur only once in 196.6 quadrillion. The prosecutor argued that Dr. Staub's testimony was credible and was not impeached. Dr. Reich, in contrast was not credible and was impeached by the omissions in his report, which failed to discuss the T-POX site and inaccurately claimed that the ISP had failed to conduct a database search using all the alleles present at the D-13 site.

¶ 138    The prosecutor recounted how, when he started to cross-examine Dr. Reich about the profile that was developed and the comparison made by Dr. Staub, Dr. Reich "refused to even acknowledge that the defendant's DNA is present at all 13 loci." Notably, the defense objected on the ground that the argument misstated the evidence and the court sustained that objection. The prosecutor then recounted how he had to go through each of the 13 loci and make Dr. Reich read the markers listed in the Bode chart and the chart of defendant's DNA standard.

> "Clearly, Dr. Reich wanted to fight on each and every level until, finally, I had to go through and ask him at each site did he see it at one si[t]e–it was almost like Ses[a]me Street. What do you see here and what did you see there."

¶ 139    The trial court's oral ruling finding defendant guilty spans about nine pages in the transcript. The trial court recounted the evidence, which included the cut telephone wires, the broken glass of the basement window, the fingerprint standards recovered from the PVC pipe and washing machine, and the pattern on the prints that matched the rubber-grip dot pattern on the gloves that were recovered at the scene and stained with the victim's blood. The trial court stated that at least three people contributed to the DNA evidence recovered from inside the gloves. Dr. Staub testified that the profile of the major contributor of the DNA, above all other individuals who at some point may have worn those gloves, unquestionably matched defendant. Dr. Reich was called to refute Dr. Staub, but after a "laborious" cross-examination,

> "[Dr. Reich had] to indicate that certainly it was still the defendant, who through every standard taken, was one of the individuals whose DNA was on those gloves, though he disputes whether or not [defendant] was a major contributor.
>
>     The Court looks at the fact that it was only the defendant who was testified to as being the one who left his DNA standards throughout every portion testified to and there's no question in this Court's mind that the defendant's DNA was within those gloves.

There is no question by the Court that he was a contributor of DNA to those gloves.

Doctor Staub did testify that he was a major contributor, by the evidence that I have."

¶ 140    Furthermore, the trial court concluded that the testimony of Worthem, the State's jailhouse witness, supported Dr. Staub's finding. The court stated, "in this case it certainly does support Dr. Staub's finding, that evidence which the Court looks at is the testimony of the State's jailhouse witness." The court went on to note that, although Worthem's testimony had to be viewed with extreme caution due to potential bias, his testimony coincided with the evidence presented and included information that he could only have received from defendant, such as defendant's entry into the victim's home, leaving his gloves behind at the scene, the type of property taken from the victim, and the victim's injuries. Those facts,

"because they are so similar to other evidence here, they become more than just coincidences and they come to a point where the Court has to look at them as they are corroborating other evidence and find, in fact, that certainly there is only one person who this information could have come from, and that is the defendant.

* * *

The Court has viewed all facts here, looked at any other hypothesis of why this occurred and how it occurred and I am convinced beyond a reasonable doubt that [it] was the defendant who perpetrated an[d] completed these crimes and killed the victim and, therefore, as to all charges, I find the defendant guilty."

¶ 141    The trial court's comments did not demonstrate an erroneous recollection of the evidence, but rather, reflected the court's observation concerning Dr. Reich's attempt to cast doubt on Dr. Staub's interpretations at the D-13 and T-POX loci by suggesting that at least two other interpretations were possible at those loci. Specifically, the trial court observed that, after a laborious cross-examination where the prosecutor took Dr. Reich through a series of questions concerning each of the 13 loci, Dr. Reich did finally acknowledge that defendant's alleles were present on each one of the 13 loci on the DNA profile taken from the swab of the gloves. The trial court correctly observed that, although Dr. Reich asserted that his alternative possible interpretations at the D-13 and T-POX loci introduced some ambiguity as to what the major profile was, Dr. Reich had conceded that a full profile of 13 loci was sufficient under scientific standards to identify an individual as a match.

¶ 142    The record here does not affirmatively demonstrate that the trial court incorrectly recalled Dr. Reich's testimony. Dr. Reich testified right after Dr. Staub on the last day of the hearing, which occurred on a Friday, and the trial court scheduled closing argument for the following Monday afternoon in order to review all the evidence before ruling. Thus, there is affirmative evidence that the trial court reviewed the testimony at issue immediately prior to making its ruling. Moreover, during closing argument, when the State argued that Dr. Reich "refused to even acknowledge that the defendant's DNA is present at all 13 loci," the trial court sustained defendant's objection on the ground that the argument misstated the evidence.

¶ 143    Additionally, the trial court's statements were not inconsistent with Dr. Reich's testimony and the other evidence presented. Defendant takes issue with the trial court's statement that Dr.

Reich had to acknowledge that defendant was one of the individuals whose DNA was on the gloves. Although the trial court did not use the same words used by Dr. Reich, defendant cannot credibly dispute that Dr. Reich conceded, during cross-examination, that defendant's alleles were present at all 13 loci of the DNA profile taken from the gloves. In addition, Dr. Staub refuted Dr. Reich's testimony that tried to cast doubt on Dr. Staub's conclusions concerning the D-13 and T-POX loci. Specifically, Dr. Staub explained how the peak heights determined the percentage range of DNA contributed by the major profile and ultimately refuted Dr. Reich's speculations about a homozygous contributor. Dr. Staub also explained that the ISP's decision not to resolve the mixture at D-13 was due to the fact that the ISP was searching the database for a profile and did not cast doubt on Dr. Staub's and Bode's consistent conclusions concerning D-13.

¶ 144 I disagree with the majority's assumption that the trial court did not find Dr. Staub's testimony more credible than Dr. Reich's testimony. The record established that Dr. Reich's testimony concerning the D-13 and T-POX loci was impeached by omissions in his report. Moreover, where the trial court accurately summarized the evidence and stated that there was "no question in this Court's mind that the defendant's DNA was within those gloves," the majority's assumption that the trial court found Dr. Reich just as credible as Dr. Staub is not reasonable. Contrary to the law, the majority would penalize trial courts that do not articulate findings in accordance with a particular word choice that is to the majority's liking. See *Curtis*, 296 Ill. App. 3d at 1000 (in a bench trial, the trial court is not required to mention everything that contributed to its findings). Even though the trial judge did not utter the words: "I find Dr. Staub's testimony credible and Dr. Reich's testimony not credible," there is no doubt, based on the judge's statements in his ruling, that the judge found credible Dr. Staub's conclusion that defendant was a 13-loci match to the majority profile recovered from the gloves, and found not credible Dr. Reich's attempts to cast doubt on that conclusion.

¶ 145 I also disagree with the majority's attempt to minimize the weight the trial court accorded Worthem's testimony. The trial court noted that Worthem's testimony had to be considered with caution, but the trial court ultimately found that Worthem's testimony contained certain facts of the crime that corroborated Dr. Staub's findings and Worthem's conversations with defendant were the only likely source of Worthem's knowledge. When considered in context, it is apparent that the trial court neither misstated nor misrecollected Dr. Reich's testimony or any of the evidence presented by the parties.

¶ 146 Defendant further argues that the trial court's incorrect recollection goes to the crux of the theory of the defense at the trial court level. I disagree. According to the record, during closing argument, the defense no longer disputed the fact that the testimony of both Drs. Staub and Reich had established that defendant's alleles were found at 13 loci of the profile taken from the gloves. Rather, the defense argued that, even if the court was not convinced by Dr. Reich's assertions concerning ambiguity at the D-13 and T-POX loci, defendant still was not connected to the crime scene because at least three individuals contributed to the DNA mixture recovered from the gloves at the crime scene and no evidence established that defendant was the last person to have worn those gloves before they were abandoned at the crime scene.

Defendant's argument on appeal is not entirely consistent with the theory he argued before the trial court, and he cannot claim error on appeal by arguing an alternate and inconsistent theory.

¶ 147 I cannot find that the trial court improperly recalled Dr. Reich's testimony. Moreover, there was other testimony that supported the trial court's verdict. No error occurred here, and I would affirm the trial court's decision.