# Illinois Official Reports

## Appellate Court

---

### *In re Montrell S.*, 2015 IL App (4th) 150205

---

| | |
|---|---|
| Appellate Court Caption | In re: MONTRELL S., a Minor, THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, v. MONTRELL S., Respondent-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-15-0205 |
| Filed | August 13, 2015 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 14-JD-81; the Hon. Brian Goldrick, Judge, presiding. |
| Judgment | Affirmed as modified. |
| Counsel on Appeal | Michael J. Pelletier, Jacqueline L. Bullard, and Janieen R. Tarrance, all of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Jason Chambers, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and Luke McNeill, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE APPLETON delivered the judgment of the court, with opinion.<br>Presiding Justice Pope and Justice Steigmann concurred in the judgment and opinion. |

**OPINION**

¶ 1        Respondent, Montrell S., appeals a judgment in which the trial court sentenced him, as a delinquent minor, to probation for 60 months, to end on his twenty-first birthday. He makes two arguments in his appeal.

¶ 2        First, he argues the evidence is insufficient to support his conviction of aggravated robbery (720 ILCS 5/18-1(b)(1) (West 2014)). Specifically, he argues that the alleged victim, Robert Hibbard, is a self-contradicting drug addict whose testimony is unworthy of belief. We decline to reweigh Hibbard's credibility. Instead, we will look at all the evidence in the light most favorable to the prosecution and ask whether any rational trier of fact could find, beyond a reasonable doubt, the elements of aggravated robbery. See *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The answer to that question is yes, as we will explain.

¶ 3        Second, respondent argues the trial court failed to give him enough presentence credit. One of the conditions of probation was that he serve 30 days' confinement in the juvenile detention center, and against those 30 days, the court gave him credit for only 4 days. The court stayed the remaining 26 days. We agree with respondent that the 41 days he was on electronic home detention should completely offset the remaining 26 days of confinement. Therefore, we modify the sentence so as to allow him 26 days of additional presentence credit, and we affirm the trial court's judgment as modified.

## I. BACKGROUND

### A. The Petition for Adjudication of Wardship

¶ 6        On May 12, 2014, the State filed a petition to adjudicate respondent, born February 13, 1997, a delinquent minor and to make him a ward of the court. The petition alleged that on May 5, 2014, he committed the aggravated robbery of Hibbard and that in so doing, he also committed the offenses of robbery (720 ILCS 5/18-1(a) (West 2014)) and mob action (720 ILCS 5/25-1(a)(1) (West 2014)).

### B. The Detention Hearing

¶ 8        On May 12, 2014, the trial court held a detention hearing. See 705 ILCS 405/5-501 (West 2014). An assistant public defender requested that, instead of sending respondent back to the juvenile detention center, the trial court put him in home confinement. Respondent's mother was present, and the court asked her if she was willing to have respondent back in her custody, on home confinement, even if "home confinement" meant being home at all times except for going to the YouthBuild program or a job. She answered yes. The court obtained her promise that she would call Juvenile Court Services if respondent violated any of the rules the court was going to impose on him as conditions of home confinement.

¶ 9        With that understanding, the trial court entered two orders. The first order was entitled "Order for Conditions of Release From Detention." This order, signed by respondent, his mother, and the court, released respondent to the custody of his mother, subject to various conditions, such as "You shall obey a curfew by remaining in your residence pursuant to the home confinement order entered May 12, 2014."

¶ 10        The second order was entitled "Home Confinement Order." This order, signed by respondent and the court, put him on home confinement, subject to the following conditions:

"A. You shall reside with your Mother *** at [a certain address] and shall not leave said residence unless physically accompanied by a parent or Court Officer and shall obey all requests of your custodian, including taking all prescribed medications.

B. You shall not leave your residence without prior authorization of the Court Officer.

C. You shall not contact personally, by telephone, in writing including emails, texting, etc., the following people: See 'no contact' addendum.

D. You shall not violate any criminal statute or ordinance, including not possessing any firearm or other dangerous weapon.

E. You shall attend school each and every day and every class for the full class period; and shall strictly obey all rules and regulations set forth in the school's policy manual.

F. You shall truthfully and completely answer all questions asked by the Court Officer or this Court, report to the Court, Court Officer or any other person as directed and shall consent to search of your person, residence, automobile or belongings at the request [of] the Court Officer or Police Officer.

G. You shall not operate an automobile or any other motorized vehicle without prior written permission by the Juvenile Court Officer.
***

I. Minor allowed out of home only for purposes of work, YouthBuild, reporting to [Juvenile Court Services], or conferring with his attorney[,] with proof of work schedule and YouthBuild schedule shown to Court Services beforehand."

¶ 11 Paragraph H read: "If initialed, Minor's release is conditioned upon compliance with Electronic Monitoring." This paragraph was not initialed in the "Home Confinement Order" of May 12, 2014. But it was initialed in the "Home Confinement Order" of July 25, 2014, which otherwise set forth the same conditions as the order of May 12, 2014.

¶ 12 On September 3, 2014, the trial court released respondent from electronic monitoring. Respondent informs us that his home confinement likewise ended at that time.

¶ 13                                          C. The Bench Trial

¶ 14 On January 12, 2015, the trial court held a bench trial.

¶ 15 The State called Hibbard as its first witness. He testified he was 32 years old and that around 11 a.m. on March 9, 2014, he left his stepfather's house, on 8th Street in Bloomington, and set out for his mother's house, on West Jackson Street. He walked up South Center Street, past its intersection with Wood Street; cut across the parking lot of Trinity Lutheran Church; and then headed west on West MacArthur Avenue.

¶ 16 As he walked along MacArthur Avenue, he noticed "two black males" across the street. He did not know either of them. One of them, wearing a blue sweatshirt and black pants, crossed the street. Upon reaching Hibbard, this person punched Hibbard in the back of the head, causing him to fall. " 'Give me all your shit right now,' " he told Hibbard. While Hibbard was still on the ground, the assailant's "buddy," the other "black male," approached. This other person had on a "fisherman cap," from beneath which dreadlocks hung down, and he was dressed in a gray sweatshirt and black pants. Hibbard identified him, in court, as respondent.

¶ 17 The prosecutor asked Hibbard:

"Q. Did the person wearing the fisherman's cap say anything?

A. He told me to give him everything or he would pop my ass. And after the other kid took everything out of my pockets, he told me to get stepping or he would pop my ass. And that's when–I kept walking. I went to my mom's house and dialed [9-1-1] and called the police department.

Q. So the individual wearing the fisherman's cap, just so I'm clear, told you he was going to–told you what?

A. Said he was going to pop my ass if I didn't keep stepping.

Q. And what did you take that to mean?

A. Well, he lifted up his shirt. He had something here that looked like a gun. And so I thought maybe I was going to get shot, so I kept walking."

¶ 18 The first of the two "kids," who, Hibbard later learned, was named Johnny J., removed from Hibbard's pockets the following items while Hibbard kept his hands raised: a Link card; a package of Newport Red cigarettes; a lighter with the image of a television celebrity, Si Robertson, on it along with a saying of Robertson's: " 'Everything I say is 95 percent truthful' "; a black Samsung Galaxy X cell phone with the music of Five Finger Death Punch downloaded onto it; and white earphones.

¶ 19 A female police officer arrived at the house of Hibbard's mother. Hibbard recounted to the female officer what had happened, gave her physical descriptions of the two robbers, and said what they had stolen from him.

¶ 20 The police then transported Hibbard to the scene of the robbery. No one there had seen what happened. During the robbery, Hibbard had dropped a shirt that was draped around his shoulders. He could not find the shirt.

¶ 21 The police then gave Hibbard a ride back to his mother's house. About an hour later, the female police officer returned and asked him to accompany her to a BP gas station, where the police were holding two suspects. She told him these suspects appeared to match the physical descriptions he had given and she wanted him to confirm they were the robbers.

¶ 22 At some point, Hibbard was patted down, either before he got in the squad car to go to the scene of the robbery or before he got into the squad car to go view the suspects. A cannabis pipe was found on his person, and the female police officer asked him if he had attempted to buy cannabis from the two suspects. He told her no.

¶ 23 At the gas station, Hibbard confirmed that the two persons the police had detained were indeed the robbers: they matched the descriptions he had given, although he hesitated a little with Johnny J., who, he thought, might have changed his sweatshirt.

¶ 24 Hibbard then went to the Bloomington police station to be interviewed. There, a detective gave him back his Si Robertson lighter, his cell phone, and his earphones. Hibbard had proved the cell phone was his by telling the detective the number to the cell phone along with music that was downloaded on it, including Five Finger Death Punch. He never got back his Link card and pack of Newport Red cigarettes.

¶ 25 On cross-examination, defense counsel asked Hibbard:

"Q. Now, is it correct that when you talked to the female officer, you indicated that you went past the Huck's on Main between Oakland and Mac[A]rthur, heading westbound when you were approached by the two black males[?]

A. No. They were–they thought it was the Huck's until I took them to the destination.

\* \* \*

Q. Now, also when you spoke to the officer, the first female officer, you said one of the subjects actually pulled out and displayed and waved about the gun; is that correct?

A. I said he lifted up his shirt, and I seen the end of a gun and the left side of his waistband."

¶ 26    The State next called Ivy Thornton, the Bloomington police officer who interviewed Hibbard at his mother's house. She testified that as she walked up to the house, Hibbard came running out of the house, shirtless. "He was very loud and animated, screaming and yelling that he had just been robbed." He described to her the robbers, told her where they had robbed him ("[the] area between Main Street and 805 West Jackson"), and listed what they had taken from him.

¶ 27    Defense counsel asked Thornton:

"Q. And he had indicated where the shirt was, and you did not find that?

A. Like I said, he was a little confused about what street he was on. So we did look. He walked with me. He was in my car. We went and drove. We didn't find his shirt.

Q. Okay. You did find, when you spoke to him, something else on his possession; is that correct?

A. Yes, I did.

Q. What was that?

A. I found a hitter pipe, which I document here[,] [in the police report]."

¶ 28    In her 13 years' experience as a police officer, Thornton had encountered many people who were under the influence of alcohol and cannabis, and Hibbard did not look to her as if he were under the influence that day. He just appeared to be "under an extreme amount of stress."

¶ 29    Defense counsel further asked Thornton:

"Q. Now do you recall where he told you he was coming from and where he was going [at the time of the incident]?

A. I do recall. He was coming from his father's house.

Q. Okay.

A. He wasn't quite sure of the streets that he had taken en route.

Q. Did he tell you he had passed the Huck's on Main between Oakland and Mac[A]rthur?

A. Yes, sir.

Q. Did he tell you he had cut through the Trinity Lutheran lot?

\* \* \*

A. No, not that I recall.

Q. Okay. Because, otherwise, you would have written that down in your report.

A. Yes, sir. It's not in here.

Q. Okay. Did he also tell you about any display of a firearm?

A. He told me–let's see–that the individual–one of the black males had a black and silver gun. He pulled it from his waistband and pointed it at him, him meaning Mr. Hibbard.

Q. Okay. Specifically.

A. Yes."

¶ 30    Forty-five minutes after her interview of Hibbard, as she was parked at the Walgreen's near the intersection of Main Street and Wood Street, Thornton saw someone who matched a physical description Hibbard had given. He was one of two "males" out walking with a "female." The prosecutor asked Thornton:

"Q. Now, from that distance could you tell anything that matched the description that you had been given by the victim?

A. Specifically the floppy fisherman's hat atop a black male that had some braids coming out the bottom. That's fairly distinctive."

The other "male" was "wearing a black sweatshirt and black pants." Thornton stopped them. Officer Bryce Janssen patted down Johnny J. and found a lighter and cell phones on his person. Officer David Ziemer patted down respondent.

¶ 31    The State next called Ziemer. He testified that after hearing the descriptions of the suspects that Thornton announced on the radio, he saw some individuals possibly matching the descriptions. He saw them as he was driving east on West Wood Street, toward Center and Main Streets. He testified:

"I saw two black males and a female walking on the street. And the black male was wearing a camouflage floppy hat. He had braids like was in the description. Another guy had a blue hooded sweatshirt. The description–it was black males, teenagers, late teens.

Q. So having seen these individuals, what did you do?

A. I asked Officer Thornton where she was at. I knew she was close in the area. And she said she was at the Walgreens right near Main and Wood. So she actually happened to see them. Because I was watching them walk away from me, and they happened to be walked like towards her. We communicated via the in-car radio.

Q. After you communicated with Officer Thornton, where did you go to?

A. She had–she stopped them over there at Main and Wood Street, and that's where I went."

¶ 32    Defense counsel asked Ziemer:

"Q. Okay. Now, when you were there at the scene with [Johnny J.] and [respondent], you patted down, did a search of [respondent], correct?

A. Correct.

Q. Did you find any firearm on him or–

A. No, I did not.

Q. –a fake firearm?

Any cell phones, headphones, things of that nature?

A. Nothing.

Q. So nothing that had been reported stolen by anybody.

A. No."

¶ 33     Janssen testified he searched Johnny J. on May 9, 2014, near the intersection of Wood and Main Streets, and found "three cell phones, a small bottle of vodka, and a lighter." He handed over these items immediately to Thornton.

¶ 34     The next witness for the State was Officer Brad Melton. He testified that on May 9, 2014, he went to a residence and picked up Hibbard for a "show-up" at a BP gas station. Ziemer brought the first suspect out of his squad car, and Hibbard "immediately said, 'That's him.' " Melton identified respondent, in court, as this first suspect.

¶ 35     At the gas station, Thornton brought out the other suspect from a separate squad car. Melton testified:

"A. The victim said that it looked like the same person, but he had–it looked like–it appeared that he had changed shirts according to the victim, so he said he couldn't 100 percent identify him, but he believed it was the same person, but he had changed clothing.

Q. And that was the second individual after he had already viewed the respondent minor, correct?

A. Correct."

¶ 36     The final witness for the State was Jared Roth, a detective with the Bloomington police department. He testified that on May 9, 2014, he interviewed Hibbard at the police station and that Hibbard listed the property of which he had been robbed.

¶ 37     Thornton had delivered the property to Roth, or "at least she [had gone] over what property [had been] stolen from Mr. Hibbard." The prosecutor asked Roth:

"Q. The property, what did you do with it in regards to Mr. Hibbard when you met with Mr. Hibbard?

A. I tried to prove that it was his.

Q. How so?

A. One of the items that was stolen was a cell phone. And one of the suspects that we arrested in this incident had actually three cell phones on him. Mr. Hibbard said, 'I can show you that I've got some particular music on the cell phone.' And he ended up showing us the music.

Q. Any other property that he had described that matched the description of the property you were given by Officer Thornton?

A. Yes. He also had some white headphones. There were some white headphones on one of the suspects. And there was also a cigarette lighter that had Duck Dynasty on it. Mr. Hibbard said that the character from Duck Dynasty, his name is Si. And he said the cigarette lighter has something to the effect of–a saying on it–95 percent of what I say is the truth or something to that effect.

Q. Now, the property that you were given by Officer Thornton, in looking at that property, did any of the property match the description that had been given?

A. It all seemed to match.

Q. As far as the Duck Dynasty lighter–

A. Yes.

Q. –with the quote on it. As far as the headphones?

A. They were consistent with what Mr. Hibbard had stolen from him. There was nothing distinguishing saying that those were his headphones, but it was consistent with what Mr. Hibbard said he had stolen.

Q. And the cell phone.

A. Yeah. It had the music that he said would be on that cell phone, which was Five Finger Death Punch.

Q. So what did you do with that property then?

A. I ended up photographing that property and ended up providing it back to Mr. Hibbard."

¶ 38 Roth also interviewed Johnny J. on May 9, 2014, at the Bloomington police station, and he identified petitioner's exhibit No. 6 as a still photograph from the video footage of the interview. In the photograph, Johnny J. was "wearing a blue sweatshirt with a hoodie on it and black pants."

¶ 39 On cross-examination, defense counsel asked Roth:

"Q. The items that you described, detective, with respect to [the prosecutor's] questions, do you know which of the suspects those items were seized from?

A. [Johnny J.]

Q. Were any of those items you described seized from the person of [respondent]?

A. I don't believe so."

¶ 40 After hearing the testimony and the arguments by counsel, the trial court found respondent guilty, beyond a reasonable doubt, of all three of the charged offenses: aggravated robbery, robbery, and mob action. In a subsequent hearing, the court sentenced him to 60 months' probation, to end on his twenty-first birthday.

¶ 41                                    II. ANALYSIS
¶ 42                          A. The Sufficiency of the Evidence
¶ 43 Respondent argues that his "aggravated robbery conviction cannot rest on the unsatisfactory and incredible testimony of Mr. Hibbard."

¶ 44 Initially, it is worth noting that, of the three offenses of which the trial court found respondent guilty–aggravated robbery, robbery, and mob action–he challenges only his conviction of aggravated robbery, and he requests us to reverse only his conviction of aggravated robbery. He does not argue the evidence was insufficient to convict him of simple robbery, the "knowing[ ] tak[ing] [of] property *** from the person or presence of another by the use of force or by threatening the imminent use of force." 720 ILCS 5/18-1(a) (West 2014). It is therefore undisputed that the evidence is sufficient to sustain the conviction of robbery. Any contention to the contrary would be forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) ("Points not argued are waived," *i.e.*, forfeited.).

¶ 45 The only difference between robbery and aggravated robbery is that, in the case of aggravated robbery, the person committed robbery "while indicating verbally or by his or her actions to the victim that he or she is presently armed with a firearm or other dangerous weapon." 720 ILCS 5/18-1(b)(1) (West 2014). It follows that, when it comes to the sufficiency of the evidence, the only proposition genuinely in dispute is whether, during the robbery

(which, we take it as a given, respondent actually committed), he "indicat[ed] verbally or by his or her actions to the victim that he or she is presently armed with a firearm or other dangerous weapon." *Id.*

¶ 46 The only evidence of that proposition was Hibbard's testimony. For eight reasons, respondent argues it would be impossible for any reasonable trier of fact to infer that Hibbard told the truth in his testimony.

¶ 47 First, according to respondent, Hibbard's testimony contradicted the statement he had made to Thornton. On the one hand, Hibbard testified that respondent merely lifted his shirt to reveal the butt of the pistol protruding from beneath the waistband of his pants. On the other hand, Thornton testified that Hibbard had told her that respondent "pulled [a black and silver gun] from his waistband and pointed it at him." Of course, the existence of a contradiction depends on whether Hibbard did indeed tell Thornton that. On cross-examination, Hibbard denied telling her that. Defense counsel asked him:

> "Q. Now, also when you spoke to the officer, the first female officer, you said one of the subjects actually pulled out and displayed and waved about the gun; is that correct?
>
> A. I said he lifted up his shirt, and I seen the end of a gun and the left side of his waistband."

¶ 48 There are two possibilities: either the trial court, as the trier of fact, was unconvinced that Hibbard really had told Thornton that respondent brandished the pistol, or, alternatively, the court concluded that this inconsistency was insufficient to merit the wholesale rejection of Hibbard's testimony. Either way, we give "great deference" to the trial court's assessment of credibility. *People v. Williams*, 2013 IL App (1st) 111116, ¶ 76.

¶ 49 We are aware of no case holding that the testimony of a witness who made a prior inconsistent statement necessarily has to be disbelieved. Rather, we have said: "Even if a prior inconsistent statement has been made, this would affect only the weight to be afforded the testimony[,] and that weight is a matter for the trier of fact." *People v. Mitchell*, 37 Ill. App. 3d 372, 376 (1976). Granted, the testimony of a witness can be so flawed and so problematic that it would be impossible for any reasonable trier of fact to believe the witness. See *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004) ("Testimony may be found insufficient under the *Jackson* standard, but only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt."). It would be an exaggeration, however, to characterize Hibbard as such a witness, a witness whom it would be impossible for " '*any* rational trier of fact' " to believe. (Emphasis in original.) *Id.* at 278 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 50 Let us assume, for the sake of argument, that Thornton was unfailingly correct in her recollection of what Hibbard had told her, including the part about respondent's actually drawing the pistol from his waistband. One rational trier of fact might reject Hibbard's testimony because of his prior inconsistent statement to Thornton, but another rational trier of fact might decide that rejecting Hibbard's testimony would be unwarranted, considering what still could be said in favor of his reliability: his exact physical descriptions of the robbers, which, as it turned out, accurately described respondent and Johnny J.; the subsequent sighting of respondent and Johnny J. together, not far from the area of the robbery; and Johnny J.'s possession of Hibbard's property, which Hibbard likewise had described with specificity. So, the prior inconsistent statement is not, as a matter of law, fatal to Hibbard's credibility.

¶ 51    Second, respondent points out that when the police stopped him and Johnny J., neither of them had a pistol on his person. But the pistol was toxic, and if he was smart, respondent would have stashed it somewhere as soon as possible after the robbery–perhaps in his residence, which, respondent notes, was not far away from the scene of the arrest.

¶ 52    Third, respondent observes that, according to Thornton's testimony, Hibbard never told her he had cut through the parking lot of Trinity Lutheran Church. But perhaps, at the time, Hibbard lacked the presence of mind to comprehensively retrace his steps for Thornton. She testified he was extremely distraught.

¶ 53    Fourth, respondent observes that, according to Thornton's testimony, Hibbard was confused about where the robbery occurred. But again, he was under great stress. Besides, it is undisputed that respondent and Johnny J. did in fact rob him.

¶ 54    Fifth, respondent observes that Hibbard could not find his shirt at the place where he said he had been robbed. Someone might have picked up Hibbard's shirt. That is why people generally do not leave their clothing on the sidewalk: it might not be there when they return.

¶ 55    Sixth, respondent argues: "The story is simply incredible that the 'kid' could deliver a blow so hard to the head that made Mr. Hibbard fall to the sidewalk without suffering any physical injury." According to Ziemer's testimony, however, Johnny J. was in his "late teens." And not everyone who is knocked down suffers a visible injury. Also, as the State points out, this argument could be turned against respondent: it is "simply incredible" that "kids" could compel Hibbard, a 32-year-old man, to meekly submit to having his pockets emptied unless respondent had threatened to shoot him.

¶ 56    Seventh, respondent characterizes Hibbard as an inherently unreliable drug addict. This characterization rests on nothing. We cannot reasonably infer that Hibbard is a drug addict simply because he possessed a cannabis pipe.

¶ 57    Eighth, respondent quotes what Thornton said about Hibbard: "To me he did not seem very truthful." This was human-lie-detector testimony, which the trial court was entitled to disregard. See *People v. O'Donnell*, 2015 IL App (4th) 130358, ¶ 32. "In a bench trial, it is the job of the trial judge, sitting as the fact finder, to make determinations about witness credibility." *Williams*, 2013 IL App (1st) 111116, ¶ 76. On the record before us, we see no reason to interfere with the trial court's prerogative to decide the truth or falsity of testimony. We are unconvinced it would be impossible for a rational trier of fact to believe Hibbard's testimony that respondent was armed with a pistol, or that respondent threatened to "pop his ass," or both. See 720 ILCS 5/18-1(b)(1) (West 2014). Therefore, we affirm the conviction of aggravated robbery.

¶ 58                                    B. Presentence Credit

¶ 59    The trial court put respondent on electronic home monitoring from July 25, 2014, to September 3, 2014. Was he entitled to presentence credit for those 41 days? The parties appear to agree that insomuch as respondent spent time in custody before serving the 26 days of stayed confinement, he would be entitled, under section 5-4.5-100(b) of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5-4.5-100(b) (West 2014)), to credit against those 26 days for the time in custody. The parties disagree, however, whether the period of electronic home monitoring qualifies as "custody" for purposes of section 5-4.5-100(b) of the Unified Code.

¶ 60 Respondent observes that, like the participants in the day reporting program in *People v. Beachem*, 229 Ill. 2d 237 (2008), he "was not free to leave his home at will or determine his reporting times, and [he] could be arrested and reincarcerated for failure to comply with the terms." He argues that the electronic home monitoring "bore the hallmarks of custodial confinement."

¶ 61 The State argues, on the other hand, that respondent is more comparable to the defendant in *People v. Smith*, 2014 IL App (3d) 130548, ¶ 43, who, the Third District concluded, had no right to presentence credit for the time he spent on home confinement as a condition of his appeal bond.

¶ 62 The trouble with *Beachem* and *Smith* is that, during the 41 days in question, respondent was not an adult participant in a day reporting program, as in *Beachem*, nor was he an adult criminal defendant released on an appeal bond, as in *Smith*. Rather, he was a minor alleged to be delinquent. That is an important distinction. His entitlement to presentence credit depends on the legislature's intent (see *Beachem*, 229 Ill. 2d at 243), and certain statutory provisions apply to him, as a minor, that do not apply to the defendants in *Beachem* and *Smith*.

¶ 63 True, "the supreme court has applied the broader adult sentencing credit requirements of section 5-8-7(b), now section 5-4.5-100(b), of the Unified Code to juveniles." *In re Darius L.*, 2012 IL App (4th) 120035, ¶ 35 (citing *In re J.T.*, 221 Ill. 2d 338, 352 (2006)). But we must keep in mind that the body of statutory law more specifically applicable to respondent is article V of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5-101 to 5-915 (West 2014)), the article entitled "Delinquent Minors." Section 5-710(1)(a)(v) of that article provides: "The minor shall be given credit on the sentencing order of detention for time spent in detention under [section] *** 5-710 *** of this Article as a result of the offense for which the sentencing order was imposed." 705 ILCS 405/5-710(1)(a)(v) (West 2014). "[E]lectronic home detention" is one of the forms of detention in section 5-710 (705 ILCS 405/5-710(1)(a)(x) (West 2014)), for which the minor "shall be given credit" (705 ILCS 405/5-710(1)(a)(v) (West 2014)).

¶ 64 Also, under section 5-710(b), "[t]he time during which a minor is in custody before being released upon the request of a parent, guardian[,] or legal custodian shall be considered as time spent in detention." 705 ILCS 405/5-710(b) (West 2014). The legislature regards the "electronic monitoring" of a minor as " '[n]on-secure custody.' " 705 ILCS 405/5-105(11) (West 2014). It would seem, then, that when a minor is released from a juvenile detention center only to be put on electronic home monitoring, the legislature regards the minor as not yet "released" from "custody." Rather, in the legislature's view, the minor has been released from secure custody to nonsecure custody. See *id.*

¶ 65 Custody is custody. By its terms, section 5-710(b) does not limit presentence credit to a certain kind of custody, such as "secure custody," and we should refrain from reading limitations or qualifications into the statute that lack any basis in the text (*DeSmet v. County of Rock Island*, 219 Ill. 2d 497, 510 (2006)). In our *de novo* interpretation of article V of the Act (see *Beachem*, 229 Ill. 2d at 243), we conclude that respondent is entitled to credit for the time he spent on electronic home monitoring.

## III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment as modified to give respondent 26 additional days of presentence credit.

Affirmed as modified.