2023 IL App (1st) 221538

FIFTH DIVISION

June 23, 2023

No. 1-22-1538

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* A.A., a Minor | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
| | ) | Cook County. |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21 JD 122 |
| | ) | |
| A.A., | ) | Honorable |
| | ) | Patricia Mendoza, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE DELORT delivered the judgment of the court, with opinion.
Justices Mitchell and Navarro concurred in the judgment and opinion.

**OPINION**

¶ 1     After a bench trial, minor respondent A.A. was adjudicated delinquent of vehicular hijacking and aggravated battery, and sentenced to 24 months of probation and 30 days of supervision. She appeals, arguing the evidence was insufficient to sustain the verdict because the victim's identification of her was unreliable. She also claims that, even conceding the State's facts, her conduct did not constitute a "taking" per the statute. Finally, she contends that the court did

not properly credit her for time spent in custody. We affirm her conviction but amend her mittimus to reflect the proper time credit.

¶ 2                                    BACKGROUND

¶ 3     On January 28, 2021, the State filed a petition for adjudication of wardship against A.A., charging her with vehicular hijacking (720 ILCS 5/18-3 (West 2020)) and aggravated battery (*id.* § 12-3.05(d)(1)) related to a January 27, 2021, incident. The record shows A.A. spent 56 days in pretrial custody, including 28 days of electronic monitoring.

¶ 4     At A.A.'s bench trial, Kenneth Wolin, 72 years old, testified that on January 27, 2021, at around 10:30 a.m., he was working as a Lyft driver. The weather was clear, but there was snow on the ground. He drove to the 2900 block of West Walton Street in Chicago to pick up a fare. When he arrived, two "girls" entered his vehicle. He saw them "[v]ery briefly" before they entered, but noted they were dressed in "winter clothing." Wolin identified A.A. in court as one of the passengers.

¶ 5     Wolin drove the passengers to a destination near the 1400 block of Douglas Boulevard in Chicago. When he arrived and stopped the vehicle, the "taller" of the two girls, seated directly behind him, reached over the headrest and choked him for one to two minutes. The passengers then instructed Wolin to exit the vehicle, and he complied. While exiting, he noticed one of the passengers enter the driver's seat of the vehicle. He then saw A.A. exit the vehicle, approach him, and ask for the key fob for the vehicle. Wolin instead gave A.A. the key fob for his girlfriend's vehicle, which he also happened to have on him at the time. A.A. walked back towards Wolin's vehicle.

¶ 6     Wolin walked to a nearby school, told a security guard what happened, and asked the guard to call the police. Chicago police officers arrived shortly thereafter and drove Wolin back to his

vehicle. Upon arrival, Wolin noticed a cell phone in the back seat that did not belong to him, along with his girlfriend's key fob. While on scene, Wolin identified A.A. to the officers during a show-up procedure.

¶ 7     Wolin testified as follows regarding the show-up:

"Q. And was this identification procedure done with the minor respondent?

A. Yes.

Q. And where was the minor respondent located as this identification procedure took place?

A. I was asked the first time they were over by the parkway and then the other one was behind the car by another squad car.

Q. So specifically for this minor respondent, where was the minor respondent during the identification procedure?

A. The first one was by the detective that was by the parkway.

Q. And did you identify anybody during that identification procedure?

A. I did.

Q. And was the same person that you identified during that identification procedure the minor respondent that you pointed out in court today?

A. Well, she was the shorter of the two if I recall. One was around five-foot-one. The other one was about five-foot-four and I believe it was the one that was five-foot-one that was talking to the officer, the little bit shorter one. *** and the other one then came later was about five-foot-four and she was—I identified her by the other car.

Q. So was the first person that you identified this minor respondent?

A. I don't know. I can't—it looks like her, yes. It does appear to be her. She

appears to be the little bit taller one which was by the other car."

¶ 8    Wolin affirmed that, before testifying, he reviewed police-recorded video of the show-up, which accurately depicted the events. The State entered the video, People's exhibit 1, into evidence, and published it to the court. The video, included in the record on appeal, depicts the interior of a police vehicle. Two voices are audible, one an officer who enters the front seat, and the second apparently from Wolin, originating from the back seat. The officer states that other officers will show Wolin someone and that Wolin should do the best he can. Wolin asks if the officers will show him pictures, to which the officer responds that Wolin will be shown a "person, the actual person." Shortly thereafter, a second officer approaches the driver's side window and tells the first officer to instruct Wolin to look out of the back window of the police vehicle, which the first officer does. The officer then asks, "can you see her?," and continues, while confirming an inaudible response from Wolin, "that looks like one of them?" The officer then continues, "I don't know if you can see black pants on, but black puffy coat?," to which Wolin responds in the affirmative.

¶ 9    Wolin confirmed that when he saw A.A. during the identification procedure, she wore the same clothing as when he first picked her up.

¶ 10   On cross-examination, Wolin agreed that both passengers wore black jackets. He agreed that the video did not depict him mentioning either passenger's height but did not recall if he told officers on scene anything about their height. Wolin believed the passengers were teenagers based on his experience as a high school counselor. The initial ride lasted around 10 to 15 minutes, during which he did not hear any conversation between the passengers. He paid attention to the road during the ride. In response to the question, "So you did not give a description about hair. You did

not give a description about weight?," Wolin responded, "They had heavy jackets on. I really couldn't tell." Defense counsel inquired about A.A.'s alleged location during the show-up, to which Wolin replied, "The one was standing on the street talking to one of the detectives over by the park side and the other one was not initially there. I don't know where she came back from, but eventually she was there." Wolin stated A.A. was speaking to "one detective" at the time he identified her at the show-up. He did not recall officers saying the person he viewed would likely be the offender.

¶ 11 On redirect, Wolin confirmed that A.A. was the offender who spoke to Wolin on the street after he exited the vehicle. At that time, Wolin could see portions of her face.

¶ 12 Chicago police detective Andrew Kovac testified that he responded to the incident on January 27, 2021, at around 10:50 a.m. There, he met and spoke to Wolin, along with other officers already on the scene. While on the scene, two women approached Kovac and pointed someone out. Kovac identified A.A. in court as the person the women pointed out. Later, at the police station, Kovac learned A.A.'s home address was on the 2900 block of West Walton.

¶ 13 The State rested, and A.A.'s counsel moved for a directed verdict, which the juvenile court denied. A.A. then rested. During closing arguments, the State argued in relevant part that Wolin identified A.A. as the offender who demanded the key fob from him and also emphasized the show-up identification. Defense counsel argued that Wolin's identification was suspect, in part because he only described the offenders as "taller and shorter," and did not testify clearly regarding whether A.A. was the taller or shorter offender. Counsel also emphasized Wolin's lack of specificity in the description he provided to the officers. Finally, counsel argued that the video indicated the show-up was overly suggestive.

¶ 14    The court found A.A. liable on both counts and adjudged her delinquent. In so finding, the court noted that the State could have introduced other evidence and found it "frustrating" that it had failed to do so. The court continued that it found A.A. liable of vehicular hijacking because the incident happened in a short period of time, and A.A. was detained near the scene, where Wolin identified her. The court also noted that because A.A. demanded the key fob, "it would be hard to say that there is no common plan or design" with her co-offender regarding the aggravated battery charge, even if A.A. was not the offender who choked Wolin. The court sentenced A.A. to 24 months' probation and 30 days in the juvenile detention center, which the court stayed. This appeal followed.

¶ 15                                         ANALYSIS

¶ 16    A.A. raises three arguments on appeal: (1) the evidence was insufficient because Wolin's identification was unreliable; (2) even conceding the identification, her conduct did not satisfy the taking element of a vehicular hijacking charge; and (3) her mittimus should be corrected to reflect her proper time credit. We first address the sufficiency of the evidence.

¶ 17    When considering the sufficiency of the evidence, a reviewing court construes the evidence in the light most favorable to the prosecution and determines whether a rational fact finder could have found the defendant guilty beyond a reasonable doubt. *People v. Hardman*, 2017 IL 121453, ¶ 37. The reviewing court will not substitute its judgment for that of the fact finder regarding the witness credibility or the weight of evidence. *Id.* Reversal based on insufficient evidence is only appropriate where "the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." (Internal quotation marks omitted.) *Id.*

¶ 18    A.A. bases her sufficiency claim on the alleged unreliability of Wolin's identification. In assessing the reliability of an identification, the reviewing court considers the factors described by

the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188 (1972). See *People v. Slim*, 127 Ill. 2d 302, 307 (1989). Identification testimony from a single witness, if found reliable, may be enough to sustain a conviction. *Id.* The *Biggers* factors include (1) the witness's opportunity to view, (2) the witness's degree of attention, (3) the accuracy of prior descriptions, (4) the witness's level of certainty at the time of confrontation, and (5) the length of time between the crime and confrontation. *Id.* at 308. Opportunity to view is the most important factor, though none is determinative. See *In re O.F.*, 2020 IL App (1st) 190662, ¶ 32 (citing *Biggers*, 409 U.S. at 199-200).

¶ 19    Applying the *Biggers* factors, we find that a rational fact finder could have found Wolin's identification reliable and based A.A.'s guilt thereon. First, Wolin's opportunity to view, the first and most important *Biggers* factor, favors reliability. Wolin identified A.A. as the offender who exited the vehicle, approached him, and demanded his key fob. The weather was clear, and there is no evidence of visibility issues. This is a specific interaction with only one of the passengers, lowering the likelihood that Wolin might have confused one passenger with another or another individual with A.A. While the length of this interaction is not in the record, it was at least sufficiently long for Wolin to look at A.A, receive a verbal instruction from her, and then comply with that instruction. This may not have lasted minutes but was sufficiently long to support his identification as reliable. See *People v. Davila*, 2022 IL App (1st) 190882, ¶ 40 (opportunity to view factor favored reliability where "although [the witness] viewed defendant for only a short period," the "lighting conditions" and positions of the witness and defendant provided "a clear and unobstructed opportunity to view").

¶ 20    A.A. argues that Wolin's opportunity to view was minimal because the initial interaction, when the passengers first entered his vehicle, was brief and her clothing would have made it

difficult for Wolin to identify her. This argument fails because while the record indicates the passengers wore heavy winter clothing, Wolin testified that A.A.'s face was at least partially visible during their interaction on the street, during which he had direct interaction with A.A. only, and he further testified that when he identified A.A., she was wearing the same clothing as when he picked her up.

¶ 21   Regarding the second *Biggers* factor, we find that Wolin's level of attention during the interaction on the street also favors reliability. A.A. again emphasizes Wolin's low level of engagement with the passengers during the initial pickup and travel portion of the incident, but this argument fails because it does not account for the subsequent interaction Wolin and A.A. had on the street. This interaction occurred after the attack, during which time Wolin had the presence of mind to give her the wrong key fob. These circumstances support a finding that his level of attention was high, favoring reliability.

¶ 22   The third factor, the accuracy of Wolin's prior description, weighs against reliability here. Wolin's description to the officers was vague, apparently consisting only of the offenders' race and clothing. Other courts have found similar descriptions too generic to support reliability. See *People v. White*, 2017 IL App (1st) 142358, ¶ 18. This factor, however, does not outweigh the others to render the identification generally unreliable, particularly when considered alongside the final two factors. Wolin's level of certainty at the show-up identification, as well as the time between incident and confrontation, both favor reliability. Neither party disputes that the time lapse supports reliability—Wolin identified A.A. at the show-up, still on-scene and only shortly after the incident. Compare this scenario to the facts in *White*, where the defendant was arrested two days after the incident, based on a generic description, but this *still* did not defeat reliability because the witness identified the offender, with certainty, at a photo array identification just three hours

after the incident. *Id.* ¶ 19; see *In re J.J.*, 2016 IL App (1st) 160379, ¶ 32. The facts here are stronger than those in *White*. The level of certainty demonstrated by Wolin on the video also favors reliability, particularly when considered in tandem with his testimony that he identified A.A. at the show-up as one of the offenders.

¶ 23 We reject A.A.'s argument that the show-up was overly suggestive. The video is clear that the officer does not suggest the person Wolin will view is likely the offender; instead, the officer clarifies to Wolin that it will be an actual human, not a photograph, the officers will show him.

¶ 24 A.A. generally attempts to discount the value of Wolin's identification by emphasizing his apparent confusion at trial regarding whether A.A. was the "taller" or "shorter" offender and where she stood during the show-up. This passage is admittedly concerning, but it does not render his entire testimony invalid such that no rational fact finder could have credited it. Most importantly, Wolin's testimony identifying A.A. as the offender who exited the vehicle and requested his key fob is direct, clear, and distinct from that passage. Moreover, while Wolin did not testify clearly regarding where A.A. stood on the scene during the show-up, his testimony is clear and certain that he identified A.A. while on scene. The juvenile court was better positioned to consider the impact the confused portion of Wolin's testimony had on his credibility as a whole, and his testimony, taken as a whole, was not so obviously unreliable or incredible that we may substitute our judgment for that of the court on this issue, even if we were inclined to do so. See *Hardman*, 2017 IL 121453, ¶ 37; *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004).

¶ 25    Additionally, there was other evidence against A.A. that supported the court's finding aside from Wolin's identification, most importantly the fact that A.A. gave as her home address the same address from which Wolin testified he picked up the passengers. [1]

¶ 26    In sum, Wolin directly identified A.A. in court as the offender who exited the vehicle to demand the key fob. Based on this interaction, Wolin had the opportunity to view A.A., while training his focus on her, and he then later identified her shortly thereafter while on scene. On this record, along with the other evidence indicative of A.A.'s guilt, we find a rational fact finder could have found Wolin's identification of A.A. reliable. Thus, A.A.'s sufficiency of the evidence claim fails.

¶ 27    A.A. next argues that even conceding the State's evidence, her conduct as alleged did not satisfy the elements for a vehicular hijacking charge because she did not "take" Wolin's vehicle. [2] Specifically, she contends that because Wolin gave her the wrong key fob, neither she nor her co-offender had the ability to operate the vehicle and thus could not "take" it.

¶ 28    We note that neither party satisfactorily stated the standard of review applicable to this issue. A.A. appears to contend this is an issue reviewed for the sufficiency of the evidence, and the State does not contest that characterization. However, we find that this is not a sufficiency issue. For purposes of this claim, A.A. cedes identification and only challenges whether her conduct as alleged satisfied the statute. In other words, both parties agree on the facts but dispute whether those facts establish the charge. This presents a purely legal issue of statutory interpretation, which we review *de novo*. *People v. Hutt*, 2023 IL 128170, ¶ 41.

---

[1] A.A. complains that this testimony was objected to at trial. The court overruled the objection. She does not argue this ruling was error on appeal, however.

[2] We note A.A. did not raise this argument at any point in the trial proceedings, but the State does not argue forfeiture before this court, and thus we may consider the claim. See *People v. Bahena*, 2020 IL App (1st) 180197, ¶¶ 28-29.

¶ 29   When interpreting a statute, a court's goal is to give effect to the legislature's intent, the most reliable indicator of which "is the language of the statute, given its plain and ordinary meaning." *People v. Reese*, 2017 IL 120011, ¶ 30. A statute cannot be interpreted to lead to absurd results. *Id.* If a statute's language is ambiguous such that the legislature's intent is not apparent from its face, the interpreting court may use tools of statutory construction to help determine legislative intent. *Palos Community Hospital v. Humana Insurance Co.*, 2021 IL 126008, ¶ 24. Those tools include legislative history and the rules of statutory construction, including *expressio unius est exclusio alterius* (*expressio unius*) and the rule of lenity. *Expressio unius* maintains that if the legislature explicitly includes certain language in one statutory section, the exclusion of that language in another section can be interpreted as intentional. *People v. Foster*, 2021 IL App (2d) 190116, ¶ 11. Under the rule of lenity, when legislative intent cannot be satisfactorily determined from a criminal statute's language or through the tools of statutory construction, the court should construe the statute to favor defendants. *People v. Gutman*, 2011 IL 110338, ¶¶ 12, 43.

¶ 30   Vehicular hijacking occurs when a defendant, "knowingly takes a motor vehicle from the person or the immediate presence of another by the use of force or by threatening the imminent use of force." 720 ILCS 5/18-3 (West 2020). "[T]akes" is undefined by the statute.[3] We note that both parties discuss the meaning of "possession" and "take" in the context of other statutes that predated vehicular hijacking, including possession of a stolen motor vehicle (*People v. Rivera*, 141 Ill. 2d 528 (1990)) and armed robbery (*People v. Strickland*, 154 Ill. 2d 489 (1992)), but neither framework is instructive here. The legislature passed vehicular hijacking as a new, specifically

---

[3]Defendant inaccurately cites *Reese* for the proposition that "actual physical possession" is required to demonstrate taking; in fact, the paragraph cited directly refutes that point, as does the fact that the phrase does not appear in the statute itself. See *Reese*, 2017 IL 120011, ¶ 1 ("We hold that the offense encompasses taking actual physical possession of a vehicle but may also be committed when a defendant exercises control of the vehicle by use of force or threat of force with the victim still present.").

defined crime, separate from the crimes discussed in *Rivera* and *Strickland*. See *Reese*, 2017 IL 120011, ¶ 40 ("in creating the new offense of vehicular hijacking, the legislature plainly intended to address criminal conduct distinct from robbery of a motor vehicle," though the new crime does "encompass situations when a victim is actually dispossessed of a vehicle").

¶ 31    We agree with the parties that whether the State must show an offender either operated the vehicle at issue, or had the capability to do so, to demonstrate taking is not clear from the face of the statute. This leads to an ambiguity we may resolve through the tools of statutory interpretation. *Palos*, 2021 IL 126008, ¶ 24. That analysis leads us to the conclusion that A.A.'s conduct here satisfied the taking element.

¶ 32    First, as other courts have emphasized, the legislative history of the vehicular hijacking statute reveals the legislature's focus was on protecting a vehicle's driver and other occupants. In *People v. Cooksey*, 309 Ill. App. 3d 839 (1999), the court stated, after reviewing the Senate proceedings regarding the statute, "[I]t is clear that the vehicular hijacking statute was enacted to combat the tragedies *** of car hijacking where someone armed or unarmed attacks a car, and *** snatches the driver out." (Internal quotation marks omitted.) *Id.* at 847. Echoing this sentiment, a panel of this court in *People v. Pryor*, 372 Ill. App. 3d 422 (2007), explained that vehicular hijacking's legislative history shows the statute "has more to do with the injury to the victim than the taking of property." *Id.* at 437. Based on this history and the intent it reveals, we believe the statute covers A.A.'s conduct here. The legislature's primary concern in enacting the vehicular hijacking statute was to prevent offenders from using force or threat to cause drivers to relinquish their vehicles; whatever use that offender might then put the vehicle to after the fact is not relevant to that concern.

¶ 33 Here, the record shows A.A. and her co-offender used force against Wolin, specifically by choking him, then ordered Wolin out of the vehicle, an order with which he complied. One offender then stayed with the vehicle while Wolin left the scene, and his vehicle, behind. This conduct completed the elements of the statute, and the fact that A.A. and her co-offender were then unable to drive the vehicle away from the scene is irrelevant. In so holding, we do not attempt to define specifically what "take" means or does not mean in any conceivable scenario under the statute; only that it does constitute a taking in situations where, as here, a driver is removed from their vehicle by force, thus leaving it in the possession of the offender, regardless of whatever use the offenders then make of the vehicle.

¶ 34 In light of this history, we are further persuaded that A.A.'s conduct is covered by the statute through consideration of the general principle that we must not interpret a statute to lead to absurd results. *Reese*, 2017 IL 120011, ¶ 30. Should we accept A.A.'s interpretation, many circumstances where an offender uses force to dispossess a driver of their vehicle would *not* constitute vehicular hijacking, an absurd result because it would run directly counter to the legislature's intent behind the statute. Consider, for instance, the situation where an offender uses force to remove a vehicle's owner from the vehicle but cannot then operate the vehicle because of a mechanical issue or lack of gas. Similarly, under A.A.'s conception, it might not constitute vehicular hijacking if, after the offender uses force to remove the driver from a vehicle, that offender then causes the vehicle to be towed to another location, instead of operating the vehicle themselves. And what of a victim who was not fortunate enough to receive aid from police officers shortly after the incident, but instead is forced away from the scene entirely, while the offender remains with the vehicle until a new key is generated? Is a vehicular hijacking not accomplished until said key is used to start the vehicle and drive it away? These hypotheticals illustrate that the specific use, if any, the offender puts a

vehicle to after using force to remove a driver should not be relevant to a vehicular hijacking charge, and thus A.A. should not escape guilt here because of her good fortune regarding the key fob.

¶ 35   We are also guided by the *expressio unius* tool of statutory construction in reaching this conclusion. Specifically, the Illinois criminal trespass to vehicles statute explicitly contains a term regarding operation of a vehicle: "A person commits criminal trespass to vehicles when he or she knowingly and without authority enters any part of or operates any vehicle ***." 720 ILCS 5/21-2 (West 2020). Based on this language, we may conclude that when the legislature intends operation to be an element of a criminal statute involving vehicles, it knows how to accomplish that with direct language, and thus the lack of an operation element in the vehicular hijacking statute can be construed as intentional. See *Foster*, 2021 IL App (2d) 190116, ¶ 15 (in context of whether a statute included attempt offenses, court found it did not because in other statutes, "when the legislature wanted to include attempts in a list of included offenses, it has done so expressly"); see also *Vestrup v. Du Page County Election Comm'n*, 335 Ill. App. 3d 156, 164 (2002) (the absence of a term in one section of a statute, "despite its presence elsewhere," suggests exclusion was purposeful).[4]

¶ 36   A.A. argues that we should look to the driving under the influence (DUI) statute, and accompanying jurisprudence, to guide our interpretation of vehicular hijacking. Specifically, she points to the fact that Illinois DUI law allows for conviction of an offender who is not currently driving only if the offender is in "actual physical control" of a vehicle. 625 ILCS 5/11-501(a)

---

[4]We note that other jurisdictions have made explicit reference to whether statutes similar to vehicular hijacking in Illinois require that the offender then operate the vehicle. See *Harper v. State*, 121 A.3d 24, 31-32 (Del. 2015) (Delaware statute states that it is not a defense if offender does not physically drive or operate the vehicle); *Harris v. State,* 728 A.2d 180, 189 (Md. 1999) (explaining that Maryland law does not require "movement or asportation").

(West 2020). Actual physical control "is determined on a case-by-case basis" through consideration of factors including whether a defendant possesses the ignition key or has the physical ability to operate the vehicle. See *People v. Morris*, 2014 IL App (1st) 130152, ¶ 17. She contends this definition should be applied to the "taking" language in the vehicular hijacking statute. We disagree.

¶ 37    The legislative intent behind the DUI statute is to prevent intoxicated individuals from operating a vehicle; the operation is the harmful act. See *City of Naperville v. Watson*, 175 Ill. 2d 399, 405 (1997) (explaining that a goal of DUI law to encourage "those who plan to drink at a party or tavern to arrange lodging or safe transportation home before they set out"). It is for this reason that "actual physical control" of a vehicle in the DUI context generally requires the capability to operate the vehicle, such as access to the keys. See *Morris*, 2014 IL App (1st) 130512, ¶¶ 17-18. Conversely, as explained above, the vehicular hijacking statute concerns conduct separate from operation. We therefore distinguish "take" in the vehicular hijacking context from "actual physical control" in the DUI context; these are separate provisions intended to apply to separate conduct, and should be interpreted accordingly.

¶ 38    Finally, A.A. contends that the rule of lenity requires us to rule in her favor here because the definition of "take" is ambiguous. *Gutman*, 2011 IL 110338, ¶ 12. The rule of lenity, however, does not apply here, because that rule is generally "subordinate to our obligation to determine legislative intent. *Id.* Because we hold the legislature's intent regarding this statute leads to the conclusion that A.A.'s conduct would satisfy the taking element, the rule of lenity does not operate to tilt the scales in A.A.'s favor. See *id.* ¶ 33 ("when the meaning of a statute becomes clear through normal rules of statutory interpretation, resort to the rule of lenity is not required").

¶ 39    A.A.'s final claim is that the juvenile court erred in calculating her time credit. Specifically, she contends the court's sentence of 30 days of detention did not include an offset for her time spent in pretrial custody. The State agrees.

¶ 40    Under section 5-710(1)(a)(v), (b) of the Juvenile Court Act of 1987 (705 ILCS 405/5-710(1)(a)(v), (b) (West 2020)), minor offenders are entitled to day-for-day credit for presentence custody, including time on electronic monitoring. See *In re Montrell S.*, 2015 IL App (4th) 150205, ¶¶ 63-65; *In re Jarquan B.*, 2016 IL App (1st) 161180, ¶ 33. The record here shows A.A. was in custody for a total of 56 days, but her mittimus does not reflect any credit for this time. Accordingly, we agree with the parties here, and pursuant to our power under Illinois Supreme Court Rule 615(b) (eff. Jan. 1, 1967), we amend her mittimus to reflect her proper time credit.

¶ 41                                    CONCLUSION

¶ 42    A rational fact finder could have found A.A. guilty based on Wolin's identification testimony, and the legislative intent behind the vehicular hijacking statute reveals that her conduct here satisfied the taking element of the charge. Accordingly, we affirm the juvenile court's finding of guilt and adjudication of A.A. as delinquent. Additionally, we amend her mittimus to reflect her proper time credit, which satisfied the 30-day custody portion of her sentence.

¶ 43    Affirmed as modified.

---

***In re A.A.*, 2023 IL App (1st) 221538**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 21-JD-122; the Hon. Patricia Mendoza, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Jonathan Krieger, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Joseph Alexander, and Taylor K. Santell, Assistant State's Attorneys, of counsel), for the People. |

---